# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| COMPOSECURE, L.L.C., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 12524-VCL |
| | ) | |
| CARDUX, LLC f/k/a AFFLUENT CARD, LLC, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 7, 2017
Date Decided: February 1, 2018

Myron T. Steele, Arthur L. Dent, Christopher G. Browne, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Steven M. Coren, David M. Devito, KAUFMAN, COREN & RESS, P.C., Philadelphia, Pennsylvania; *Attorneys for Plaintiff/Counterclaim Defendant*.

David J. Margules, Elizabeth A Sloan, Erika R. Caesar, Jessica C. Watt, BALLARD SPAHR, LLP, Wilmington, Delaware; *Attorneys for Defendant/Counterclaim Plaintiff*.

**LASTER, V.C.**

CompoSecure, LLC manufactures and sells metal credit cards. When banks issue credit cards, they have to purchase the physical cards for their customers. Metal cards cost more than plastic cards, so issuing banks generally have not been interested in metal cards.

To promote and sell its metal cards, CompoSecure hired CardUX, LLC, a newly formed sales organization. The individuals behind CardUX had extensive contacts in the credit card industry and particular expertise with co-brand arrangements. Under a co-brand arrangement, a bank that issues credit cards partners with another company, such as an airline or retailer, to issue a card that bears the marks of both the issuing bank and the partner. The affiliation helps the issuing bank gain customers. In return, the issuing bank pays a fee to the co-brand partner.

CardUX's principals planned to use their industry contacts to promote metal cards. They thought co-brand partners could insist on metal cards when contracting with issuing banks. They also believed that they could significantly increase the overall demand for metal cards, which would increase CompoSecure's order volume.

To govern their relationship, CompoSecure and CardUX entered into a detailed sales agreement. It specified the efforts that CardUX would make to promote and sell metal cards. It also provided that CardUX would receive a 15% commission on all sales of CompoSecure products to a list of "Approved Prospects." The agreement did not require that CardUX establish any connection between its efforts and a sale to earn a commission. Because much of CardUX's work would involve increasing awareness about metal cards and influencing consultants and other industry figures, its principals steadfastly refused to accept any language conditioning their commissions on a connection between their efforts

1

and a sale. CompoSecure ultimately agreed. The resulting bright-line rule created situations in which each side might receive a windfall. On the one hand, CardUX would receive a commission for every sale to an Approved Prospect, even if its efforts did not contribute to the sale. On the other hand, CompoSecure would not have to pay a commission for any sale to a non-Approved Prospect, even if CardUX's efforts contributed to the sale.

When CompoSecure entered into the agreement, its CEO expected that it would take a year to see new business from Approved Prospects. The CEO anticipated relatively modest sales growth over the next five years. Instead, just two months after signing, CompoSecure received a massive order for an Approved Prospect.

CompoSecure's CEO immediately realized that CardUX was entitled to a commission, but she and her management team did not want to pay. They did not believe that CardUX had done anything to generate the sale, and the size of the commission made the bright-line arrangement seem unfair. In the immediate aftermath, it was not clear whether CardUX had contributed to the sale. The evidence at trial demonstrated that the sale occurred independent of CardUX's efforts.

The parties had compromised on smaller issues, and CompoSecure expected CardUX to agree to a reduced commission given the circumstances surrounding the sale. Instead, CardUX stood firm on the contract. Hard feelings ensued, and CompoSecure raised a series of objections to paying the commission. Although some were fairly litigable, CompoSecure's witnesses at trial conceded that others lacked any factual basis.

Six months after signing the sales agreement, CompoSecure claimed that its CEO lacked authority to sign it. When the agreement was executed, no one questioned its

validity, and the contract contained representations stating that it was duly authorized and constituted a valid and binding obligation. After signing, both sides acted as if it was a valid contract. But someone on CompoSecure's side spotted a provision in its limited liability company agreement that required special approvals for transactions with related parties. One of CardUX's principals was a member and manager of CompoSecure when he signed the sales agreement, so the provision applied.

CompoSecure sued in this court seeking a declaration that the sales agreement was invalid. CardUX counterclaimed for its commission.

This decision agrees that the agreement was a related-party transaction and that CompoSecure's CEO did not have actual authority to bind CompoSecure to the contract. Nevertheless, the agreement is valid and enforceable. Under New Jersey law, which governs the agreement and all matters arising out of or relating to it, CompoSecure ratified the agreement by conduct.

This decision holds that CardUX is entitled to its commission. The plain language of the sales agreement provides for a commission. New Jersey law permits a court to consider extrinsic evidence to test a plain-language interpretation. Both the negotiating history and CompoSecure's post-contracting actions provide confirmation.

CompoSecure has objected strenuously that the resulting payment scheme creates an egregious and one-sided "no efforts" contract that contemplates "pay without performance," but neither slogan is accurate. The agreement requires "efforts" and specifies multiple tasks that CardUX had to perform. The agreement also links pay to performance by only providing for a commission if a sale to an Approved Prospect takes

place. CompoSecure has sole discretion to accept a sale. Unless CompoSecure receives the benefit of an incremental sale to an Approved Prospect, CardUX does not get paid. What the agreement does not require is any link between CardUX's efforts and a particular sale to an Approved Prospect. CompoSecure may now regret entering into that arrangement, but that is not a basis for evading a contract. "Parties have a right to enter into good and bad contracts, the law enforces both."[1]

This decision also rejects CompoSecure's affirmative defense of unclean hands. CardUX is entitled to recover its attorneys' fees and costs under an indemnification provision in the sales agreement.

## I.  FACTUAL BACKGROUND

Trial took place over four days. The parties submitted 533 exhibits and lodged nine depositions. Eight fact witnesses and three experts testified live. The following facts were proven by a preponderance of the evidence.

## A.  CompoSecure

CompoSecure is a Delaware limited liability company that "manufactures and sells complex metal and composite cards for the security and financial transaction industries."[2] John Herslow and his daughter, Michelle Logan, co-founded the business in 2000.[3] Logan

---

[1] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

[2] Pre-Trial Order ("PTO") ¶¶ 1, 3; *see also* Hollin Tr. 6.

[3] PTO ¶ 5.

began running the business in 2004 and took over as Chief Executive Officer in 2012.[4] Herslow remained the Chief Technology Officer.

Since 2012, CompoSecure has experienced significant growth, largely from sales of its metal credit card products. "CompoSecure is believed to be the only U.S. based metal credit card manufacturer, and is one of only two firms in the world with that capability."[5] An earlier generation of metal credit cards suffered from quality control problems, but CompoSecure developed a variety of technologies and business practices that solved these issues. No one else manufactures metal cards of similar quality, giving CompoSecure a virtual monopoly position in the metal-card market.[6]

Banks that issue credit cards purchase the physical cards for their customers. Metal cards cost far more than plastic cards. Depending on the type, a metal card costs up to $700.[7] A plastic card costs less than $0.50.[8]

Because of the price differential and lingering concern about quality, issuing banks historically resisted purchasing metal cards. JPMorgan Chase ("Chase") was an exception. Chase issues CompoSecure's metal card products to mass-affluent and high-net-worth

---

[4] *See id.* ¶ 6; Logan Tr. 143-145 (describing history of business).

[5] PTO ¶ 3.

[6] *See* Hollin Tr. 112; Logan Tr. 147-49, 155-58.

[7] Logan Tr. 156.

[8] Kleinschmidt Tr. 905.

customers in its proprietary Sapphire Card program.[9] Chase found that its customers liked the cards, and this preference generated business advantages for Chase, including better customer retention and higher spend. As Chase ramped up its Sapphire Card program, CompoSecure found itself in the happy position of selling more metal cards, but with Chase representing an increasing proportion of CompoSecure's sales.

CompoSecure also sold cards indirectly through personalization partners, who acted as middlemen by ordering cards from CompoSecure, adding features of their own, then selling the cards to an issuing bank.[10] CompoSecure gave personalization partners a 15% discount on their card purchases.[11] CompoSecure viewed the discount as the functional equivalent of a 15% commission for selling its cards.[12]

## B. CompoSecure Seeks Outside Capital.

In 2013, CompoSecure's owners "hired a business brokerage . . . to explore a potential sale of the Company."[13] One interested investor was LLR Partners, a private

---

[9] *See* Logan Tr. 151-56 (describing CompoSecure's metal card products and Chase's use of them in its Sapphire Card program).

[10] *See id.* at 159-61 (explaining role of personalization partners).

[11] *Id.* at 192.

[12] JX 67 at 1.

[13] PTO ¶ 8; *see also* Hollin Tr. 8; Logan Tr. 165-66.

equity firm based in Philadelphia.[14] Mitchell Hollin, a partner at LLR, led the team for the CompoSecure investment.[15]

Hollin asked Kevin Kleinschmidt to help evaluate the investment.[16] Kleinschmidt was a former credit-card executive who had extensive experience with co-brand relationships. This concept involves an issuing bank affiliating with a partner to issue a credit card that bears the marks of both the issuing bank and the partner. The card typically grants the holder benefits associated with the partner, such as reward points or a discount on the partner's products. A classic example is an airline credit card that rewards the holder with frequent flyer miles. By affiliating with a partner, an issuing bank can use the partner's market appeal to sign up customers. In return, the issuer pays the partner a fee.[17]

Kleinschmidt had worked with co-brand relationships throughout his career. In 1999, he joined First USA, a credit-card bank that pioneered the sale of cards through co-branding.[18] When First USA's CEO, Richard Vague, left to co-found Juniper Bank, Kleinschmidt joined him as Juniper's director of strategic planning. Barclays Bank later acquired Juniper, which became the cornerstone of its credit card operations in the United

---

[14] PTO ¶ 9; *see also* Hollin Tr. 6-7.

[15] Hollin Tr. 6.

[16] PTO ¶ 12; *see also* JX 3 at 2.

[17] *See* Flanagan Tr. 440-41; Frantz Tr. 681-82; Kleinschmidt Tr. 870-71; Logan Tr. 162-63.

[18] Kleinschmidt Tr. 858-60.

States. Kleinschmidt developed a marketing group for Barclays that handled co-brand programs.[19] In 2007, Kleinschmidt left Barclays and joined Vague and other former members of the team from First USA and Juniper at Energy Plus, a start-up that pioneered co-branding in the energy industry.[20] After they sold Energy Plus, Kleinschmidt decided to take a break from full-time work.[21]

Kleinschmidt immediately flagged CompoSecure's customer concentration with Chase.[22] In 2013, Chase accounted for roughly 75% of CompoSecure's revenue.[23] Well over half of the Chase business came from its proprietary Sapphire Card.[24] CompoSecure's dependence on Chase created multiple layers of risk. Chase could determine unilaterally whether to stop buying metal cards or to reduce its purchases,[25] and Chase would not agree

---

[19] *Id.* at 860-68.

[20] *Id.* at 874-77.

[21] Vague formed Gabriel Investments, a private investment firm, to manage his wealth. Kleinschmidt and others who had worked with Vague also invested in deals through Gabriel Investments. *See* Flanagan Tr. 528-30; Kleinschmidt Tr. 878-80.

[22] JX 5 at 1; Hollin Tr. 11.

[23] JX 6 at 1. In 2015, sales to Chase still represented 66% of revenue. Logan Tr. 167.

[24] Kleinschmidt Tr. 900-01.

[25] Hollin Tr. 28, 122; Kleinschmidt Tr. 903.

to long-term purchase commitments.[26] Chase also used its buying power to demand discounts.[27]

Kleinschmidt identified CompoSecure's small sales staff as a relative weakness. The group's primary contacts were with personalization partners or low-level managers at issuing banks. The group had not established relationships with key decision-makers. They also had no strategy for educating co-brand partners about metal cards and using the partners' influence to spur demand.[28]

After receiving early indications of investor interest, CompoSecure delayed the process. The company was experiencing significant growth, and its owners hoped to achieve a higher valuation after another year of results.[29]

Discussions and due diligence resumed in mid-2014.[30] LLR made a proposal in October 2014, and negotiations ensued.[31] LLR ultimately paid $100 million in return for 60% of CompoSecure's equity.[32] Hollin asked Kleinschmidt and Vague to participate in

---

[26] Kleinschmidt Tr. 900-03.

[27] Hollin Tr. 28; Logan Tr. 169.

[28] Kleinschmidt Tr. 907-08.

[29] Logan Tr. 166.

[30] PTO ¶ 14; *see also* Hollin Tr. 14-15.

[31] PTO ¶ 16.

[32] Hollin Tr. 31. The investment was leveraged. LLR and its co-investors invested $30 million in equity and raised another $70 million in debt. *Id.*

the transaction by investing $500,000 each, which they did.[33] Hollin also asked Kleinschmidt to serve as a member of the Board of Managers (the "Board") that would govern CompoSecure after LLR's investment closed. Kleinschmidt agreed.[34]

Hollin even asked Kleinschmidt to consider taking the CEO job.[35] Kleinschmidt declined, recommending instead that CompoSecure consider hiring Paul Frantz in a capacity that could lead to the CEO role.[36] Frantz was a former credit-card marketing executive with American Express and First USA who became one of the first employees at Juniper.[37] While at Juniper, and later at Barclays, Frantz ran the customer acquisition effort and marketed to co-brand partners. He followed Vague and Kleinschmidt to Energy Plus, where he was chief marketing officer.[38]

Frantz sent his resume to Hollin.[39] He signed a non-disclosure agreement, reviewed confidential information, and met with Herslow and Logan.[40] He ultimately declined to

---

[33] PTO ¶ 27; *see also* Kleinschmidt Tr. 884-86.

[34] PTO ¶ 30; *see also* Hollin Tr. 32-33.

[35] Hollin Tr. 20.

[36] JX 25 at 1; Frantz Tr. 661; Hollin Tr. 21.

[37] Kleinschmidt Tr. 867.

[38] Frantz Tr. 657-58.

[39] JX 27; Frantz Tr. 664-65, 847.

[40] Frantz Tr. 664-65; Logan Tr. 297-99.

10

accept a full-time position, citing CompoSecure's location and the importance of "a very flexible work environment/situation."[41]

During this litigation, CompoSecure made an issue out of the description of Frantz's background that appeared in CardUX's initial proposal, which said he had held a senior position at Chase.[42] The statement was imprecise; it referred to Frantz's position at First USA/Bank One, which Chase acquired after he left.[43] The reference was not materially misleading, and Logan and Herslow had Frantz's resume, which did not refer to Chase.[44]

## C. CardUX

Although neither Kleinschmidt nor Frantz wanted to work for CompoSecure full-time, both saw an opportunity to expand CompoSecure's sales. Their basic strategy was to convince co-brand partners "to ask for/demand a metal card."[45] For the issuer, a metal card represents a cost, but for the co-brand partner, it offers a way to distinguish its card program from others, particularly for upscale customers. Kleinschmidt and Frantz believed that, when an issuer solicited a co-brand partner's business or when the co-brand partner's contract came up for renewal, the co-brand partner would "have a lot of leverage . . . [and

---

[41] JX 32 at 1; Frantz Tr. 665.

[42] JX 48 at 5.

[43] Frantz Tr. 671-72.

[44] *Id.* at 672; Logan Tr. 294-95, 299.

[45] Frantz Tr. 646.

11

could] force their issuer to agree to buy metal cards for the program."[46] Kleinschmidt believed that many co-brand partners did not know about metal cards.[47] By educating co-brand partners, consultants, and other industry figures, Kleinschmidt and Frantz thought they could increase overall demand for metal cards. Because CompoSecure had a virtual monopoly on metal cards, the orders would go to CompoSecure.[48]

In a March 2015 email to Hollin, Kleinschmidt floated the idea of creating an independent sales organization "that sources new business for [CompoSecure] primarily (or solely) on a pay for performance basis."[49] The "independent sales organization" was a fancy term for a separate entity that would provide services to CompoSecure as an independent contractor, rather than an agent. That entity became CardUX.[50]

Hollin liked the concept and raised it with Logan,[51] who thought it was "a good idea."[52] Working with Holly Flanagan, Kleinschmidt and Frantz developed a more detailed

---

[46] Kleinschmidt Tr. 906-07; Hollin Tr. 123.

[47] Kleinschmidt Tr. 906.

[48] *Id.* at 910-11.

[49] JX 32 at 2.

[50] CardUX was formerly called Affluent Card, LLC. The parties' testimony and the contemporaneous documents refer at times to Affluent. The name change is not significant. For consistency, this decision refers to the entity as CardUX.

[51] Hollin Tr. 38.

[52] Logan Tr. 170.

proposal.[53] Flanagan also had experience with marketing credit cards. She had worked in business development, marketing, and co-brand partnering at MBNA America. She then joined Juniper, where she worked with Kleinschmidt on co-brand programs.[54]

Kleinschmidt, Frantz, and Flanagan initially proposed to "take over the entire sales organization for CompoSecure," and "do everything soup to nuts."[55] CardUX would be compensated on a "commission-type model" tied to increased sales.[56] They proposed a 20% commission on all sales growth over the existing customer revenue run rate.[57]

On April 9, 2015, Kleinschmidt and Frantz pitched the idea to CompoSecure.[58] Logan and her team resisted the 20% commission and the idea of turning over the entire sales operation, but expressed interest in a more limited proposal.[59] Logan deferred further discussions until after the LLR investment closed.[60]

---

[53] *See* JX 37.

[54] Flanagan Tr. 438-40. She later joined Gabriel Investments as a managing director. *Id.* at 442-43.

[55] Frantz Tr. 674.

[56] *Id.* at 700-01.

[57] JX 37 at 11; JX 48 at 10; Frantz Tr. 675; Logan Tr. 323-24.

[58] JX 42 at 1.

[59] *See* JX 43 at 1; JX 49; JX 51.

[60] JX 42; Hollin Tr. 30-31.

**D.    The LLR Investment Closes.**

On May 11, 2015, the LLR investment closed.[61] Before the transaction, CompoSecure had been a New Jersey limited liability company.[62] As part of the transaction, CompoSecure was converted into a Delaware limited liability company, and the parties entered into a detailed limited liability company agreement to govern CompoSecure's internal affairs (the "LLC Agreement").[63] All of CompoSecure's outstanding Class A and Class B units were converted into a total of 44,000 Class A Units, with 26,040 held by Logan, another 12,000 held in trusts for her children, and the remaining 4,400 held by a former employee.[64] CompoSecure issued 66,000 new Class B Units to LLR and its co-investors, with 63,402.27 Class B Units held in funds controlled by LLR.[65]

Before closing, LLR's attorneys emailed draft deal documents to Kleinschmidt, including the LLC Agreement.[66] "All of the Members of the Company tendered signature pages for the LLC Agreement,"[67] including Kleinschmidt.[68]

---

[61] PTO ¶ 19.

[62] *Id.* ¶¶ 4, 20.

[63] The final LLC Agreement appears at JX 58. Citations to the LLC Agreement appear in the form "LLCA § __."

[64] PTO ¶¶ 21-22.

[65] *Id.* ¶¶ 24-25.

[66] *See* JX 52-53; JX 55.

[67] PTO ¶ 29.

[68] JX 56 at 1.

14

"Upon the execution of the LLC Agreement, Kleinschmidt became a member of the Board as one of LLR's designees."[69] "LLR's two other designees were Hollin and Justin Reger."[70] "The Class A Majority's designees were Logan and Herslow."[71]

## E.    CompoSecure and CardUX Outline Terms.

Later in May 2015, CompoSecure and CardUX resumed their discussions about the terms of a sales agreement.[72] Logan initially took the lead for CompoSecure. On May 21, she sent a proposal to Kleinschmidt that contemplated a three-tiered commission structure: 15% on orders of 5,000 cards or less, 12% on orders of 5,001 to 20,000 cards, and 10% on orders of 20,001 cards or more.[73] She envisioned CompoSecure identifying co-brand prospects where CompoSecure had made inroads and excluding them from the structure.[74]

Frantz responded for CardUX and rejected the proposal. He explained that, because their work with co-brand partners would lead to large orders, the CompoSecure proposal effectively offered a commission of 10%. CompoSecure's proposal also excluded the largest co-branding partners, which made it less attractive.[75]

---

[69] PTO ¶ 30.

[70] *Id.* ¶ 31.

[71] *Id.* ¶ 32.

[72] JX 65.

[73] JX 69 at 3.

[74] *Id.*; Logan Tr. 326.

[75] JX 69 at 1; Frantz Tr. 678.

15

On June 5, 2015, Frantz sent Logan a counterproposal.[76] It called for a commission of 20% on "any [CompoSecure] product purchased by an approved prospect that is initiated during the term of our contract or for 5 years after the termination."[77] The proposal contemplated a list of approved prospects so that CardUX could avoid interfering "with [CompoSecure's] existing issuer relationships or sales/account management process."[78]

A central question in this litigation has been whether the parties expected CardUX to receive a commission if an approved prospect ordered metal cards, but the order came through an issuing bank, such as Chase, that was not on the approved prospect list. CardUX made it clear that it wanted a commission on these sales, and Logan and the CompoSecure team understood this. For example, in an email to Logan on May 24, 2015, Frantz explained that if CardUX could not receive compensation for sales that came through CompoSecure's existing customers, then they did not think the effort was worth pursuing.[79] In an email to Hollin on June 9, Logan proposed moving forward with the CardUX relationship, specifying that CardUX would not "handle any issuing banks that we currently have relationships with directly" and instead would work "through the specific co-branded partners themselves."[80] Using the example of British Airways, a Chase-affiliated partner,

[76] JX 77.

[77] *Id.* at 2; *see also* Frantz Tr. 690; Logan Tr. 330-31.

[78] JX 77 at 1.

[79] JX 69 at 2.

[80] JX 81 at 1; *see also* Logan Tr. 331-33.

16

she explained that if CardUX wanted to promote metal cards with British Airways, they had to deal with British Airways. They could not deal with Chase.[81] At trial, Logan agreed that she always understood that CardUX planned to focus on the co-brand partners and wanted a commission on orders for approved prospects even if the issuer was an existing CompoSecure customer and not on the approved prospect list.[82]

Rather than being concerned about sales coming through existing customers, Logan had different objections. She thought the overall economics were too generous to CardUX.[83] She worried that if CardUX and a personalization partner each had a hand in selling to a co-brand partner, then CompoSecure could end up giving the 15% discount to the personalization partner and paying the 20% commission to CardUX.[84] She also disliked CardUX's proposal for perpetual commissions on subsequent orders from an approved prospect, because she thought it would negatively affect what a buyer would pay for CompoSecure in a future deal.[85]

---

[81] Logan Tr. 332-33. In other emails, Logan recognized that CardUX would be going around CompoSecure's current customers (the issuing banks like Chase) to speak with the co-brand partners. *See* JX 51 (Logan citing the "business awkwardness issues of their guys end-running our current customers to go to affinity partners"); JX 70 (Logan noting that "[g]oing to our current customers could be dangerous too").

[82] Logan Tr. 325, 327-28.

[83] *See* JX 69 at 1 (Logan writing to colleague, "This is clearly [a] money grab. I am not signing up for this. No way.").

[84] JX 81 at 1; Logan Tr. 334-35.

[85] JX 81 at 1.

After further discussion, CardUX proposed a different commission structure: (i) 20% on deals in which the average price-per-card was under $100, (ii) 15% commission on deals in which the average price-per-card was over $100, and (iii) no commission on deals in which CardUX had "not been meaningfully involved in selling a cobrand partner or issuer *and* the new sale results in compensation to a perso partner."[86] This was the first, and only, time that CardUX made a proposal that turned on whether CardUX had some degree of direct involvement in the sale (here, "meaningfully involved"). The efforts clause[87] in the proposal only related to sales involving compensation to a personalization partner. CardUX included the concept because of Logan's concern about double payments.[88] There is no indication that CardUX proposed linking its commissions more broadly to any efforts-based standard. At trial, Logan confirmed that it was "the only proposal that was ever made by CardUX that had an efforts clause."[89]

---

[86] JX 87 at 2 (emphasis added).

[87] The parties have used the term "efforts clause" to refer to a provision that linked CardUX's entitlement to a commission with some degree of causal connection between CardUX's activities and the sale. The term is somewhat misleading because the ultimate sales agreement contained an explicit section detailing specific efforts that CardUX had to make. The real issue was not whether CardUX would make efforts, but rather whether CardUX would have to show some degree of causal connection between its activities and a sale to earn a commission. More accurate terms might be "causation clause" or "involvement clause." Because the parties have used "efforts clause," this decision adopts that usage.

[88] JX 85 at 1.

[89] Logan Tr. 339.

On June 17, 2015, CompoSecure simplified the structure by proposing a "15% flat commission on all orders."[90] CompoSecure's proposal did not condition payment on a showing that CardUX was involved in the sale.[91] CompoSecure also proposed "perpetual commissions as long as your Team is meaningfully involved."[92] Perhaps sensing a backdoor efforts clause, Frantz asked what "meaningfully involved" meant. Logan explained:

> [W]e would expect that [CardUX] would not be "done" once they had made the sale. We expect them to be an additional touch point to co-brand or new clients and attend any quarterly meetings along with our project manager, and potentially be able to glean metrics information from new co-brand partners that would help us with future sales since we have been unable to get that information from issuing banks.[93]

The concept of being "meaningfully involved" did not apply to initial commission. It applied to continuing commissions for subsequent orders from the same customer.[94]

CardUX accepted CompoSecure's terms. On June 24, Logan drafted a memorandum that summarized the terms, circulated it to her senior management team and the Board (excluding Kleinschmidt), then forwarded it to Hollin and CompoSecure's

---

[90] JX 90 at 2.

[91] Logan Tr. 342-43.

[92] JX 90 at 2.

[93] JX 91 at 1.

[94] Hollin Tr. 90.

19

lawyers.[95] The term sheet contemplated CardUX being "compensated for any [CompoSecure] product purchase[d] by an approved prospect that is initiated during the term of our contract or for their prospects that become clients for the following 2 years after the termination of the contract."[96] The term sheet did not include any requirement that CardUX show that its efforts led directly to a particular sale. The term sheet provided that CardUX would receive "0% on all deals where they cannot prove meaningful involvement in selling the co-brand partner and the new sale results in compensation to a personalization partner."[97] This provision addressed the double compensation issue and was limited to sales that would result in compensation to a personalization partner.

None of the Board members objected to the term sheet. CompoSecure's CFO responded that the draft "looks good," and Herslow told Logan to "let it fly." Hollin had one comment relating to expense reimbursements.[98]

On July 1, 2015, the Board met for the first time. Logan made a brief presentation about CardUX, and Kleinschmidt explained the overall strategy.[99] The Board supported the plan, and there was "a lot of enthusiasm for getting the deal done."[100]

---

[95] JX 95.

[96] *Id.* at 4.

[97] *Id.*

[98] *See* JX 95; JX 96 at 1; Logan Tr. 347-49.

[99] JX 100 at 3; Kleinschmidt Tr. 1056-57.

[100] Kleinschmidt Tr. 1057; *see also id.* at 954-55.

20

**F.      CompoSecure and CardUX Negotiate A Formal Agreement.**

Shortly after the Board meeting, Logan's mother was diagnosed with terminal cancer. From that point on, although Logan remained involved, Hollin led the negotiations for CompoSecure.

On July 22, 2015, Hollin sent Kleinschmidt a draft of the agreement.[101] Contrary to the term sheet, CompoSecure's counsel introduced several efforts clauses. Section 6.2(e) provided for a commission on a sale "to an Approved Prospect or Customer . . . as a direct result of [CardUX's] services . . . ."[102] Section 6.2(f)(iii) stated commissions would not be paid "for any sale to an Approved Prospect for which [CardUX] cannot prove meaningful involvement."[103] The draft defined "Customer" as "an Approved Prospect that has acquired a Product through the sales efforts of Sales Representative."[104] It defined "Approved Prospect" as "the companies listed on **Schedule 2** attached hereto, as amended from time to time as provided in this Agreement."[105]

On July 31, 2015, Kleinschmidt rejected the efforts clauses.[106] Addressing Section 6.2(e), Kleinschmidt responded that CardUX intended "to be compensated for all Customer

---

[101] JX 109.

[102] *Id.* §§ 6.2(e), 6.2(f)(iii).

[103] *Id.*

[104] *Id.* § 1.

[105] *Id.*

[106] JX 113 at 2-3.

21

Orders . . . into perpetuity, regardless of whether it's an original, expired, or renewed agreement with CompoSecure."[107] Addressing Section 6.2(f)(iii), he reiterated this point: "[W]e can not [sic] agree to this provision – our intention is to be compensated for all Customer Orders."[108]

Kleinschmidt also objected to the definition of "Customer," explaining that it failed to reflect "how the sales process will work and who we would often be calling on and influencing."[109] He elaborated:

> In many cases we will be selling to an intermediary (i.e. Delta) who will then work with an issuer (i.e. Amex) to generate a new CompoSecure Customer order. Perhaps replacing the use of a defined term "[C]ustomer" with "Customer Order" will help avoid the confusion. We recommend Customer Order have the definition along these lines: "any purchase of Compo[S]ecure products that bears the marks of or are used in association with any Approved Prospect. To further clarify, the Customer Order might come from an Approved Prospect or an Issuer associated with an Approved Prospect." In the example of Delta, Delta would not place the order with CompoSecure, and may never talk with the CompoSecure directly. The order would come from Amex because of the request or requirement made on Amex by Delta.[110]

This explanation directly addressed the situation in which an issuing bank placed an order with CompoSecure for an Approved Prospect. At trial, Kleinschmidt explained that "if those programs ever had cards purchased associated with them, had marks and all that stuff, [then] they would be counted as a sale. And it wouldn't matter whether it was purchased

---

[107] *Id.* at 3.

[108] *Id.*

[109] *Id.* at 2.

[110] *Id.* at 2-3.

by an approved issuer or excluded customer . . . like Amex."[111] At trial, Logan confirmed that she understood Kleinschmidt's point, namely that if CompoSecure sold cards to an issuing bank, "and the issuer is not an approved prospect but the card is for an approved prospect," then CardUX "get[s] a commission."[112]

The CardUX principals explained at trial why they consistently rejected any type of efforts clause. First, given the nature of what CardUX would be doing, in many circumstances it would be impossible to prove a connection.[113] Second, any subjective standard, such as "meaningfully involved" or "directly related," would lead to disputes.[114] Third, automatically receiving commissions on sales to Approved Prospects counterbalanced the fact that "most of the credit card world" was "not on the list."[115] By broadly working to popularize metal cards, CardUX "would be over time generating business that would not be related to those [A]pproved [P]rospects."[116] CompoSecure

---

[111] Kleinschmidt Tr. 921.

[112] Logan Tr. 364; *see also id.* 369.

[113] Flanagan 546 ("[I]t would be difficult to ascertain specifically what work we did connected to what orders."); Frantz Tr. 707 ("[I]n many cases we would be working through these cobrand partners and they would be demanding their issuers, so we weren't sure there would be necessarily a . . . direct connection between the order and our efforts. We also knew we were going to be promoting these to other folks in the industry, brokers that might put this in an RFP that we don't know about, or eventually doing some other general marketing activities.").

[114] Frantz Tr. 722-23; Kleinschmidt Tr. 927-32, 936-37; *see also* Logan Tr. 198-99.

[115] Kleinschmidt Tr. 987-88; *see also* Frantz Tr. 786-87.

[116] Kleinschmidt Tr. 936.

would get the benefit of those sales without paying commissions, regardless of any connection to CardUX's efforts. Reciprocally, CardUX wanted a commission for sales to Approved Prospects, regardless of any connection to CardUX's efforts.[117]

Hollin did not object to Kleinschmidt's deletion of the efforts requirements.[118] He only pushed back on paying commissions "forever and unconditionally" on further orders from the Approved Prospect.[119] Ultimately, CompoSecure and CardUX compromised: CardUX would receive commissions for a period of fifteen years.[120]

At this point, Hollin sought input from the CompoSecure management team. Logan reported that the team wanted to make sure that (i) CardUX continued to service an Approved Prospect after the initial sale and (ii) CardUX would receive a reduced commission if a customer's purchase came through a personalization partner. The management team also expressed concern about the impact of CardUX's commission on CompoSecure's margins.[121] The team did not cite the lack of any requirement for CardUX to show a connection between its activities and a particular order.

---

[117] Frantz Tr. 805, 845; *see also* Kleinschmidt Tr. 936.

[118] JX 113 at 2.

[119] *Id.*

[120] JX 165 § 6.2(e).

[121] JX 123 at 3.

On August 17, 2015, Hollin sent a revised draft that retained the efforts clauses in Sections 6.1, 6.2(e), and 6.2(f)(iii).[122] It revised the definition of "Customer" to clarify that "[i]f an Approved Prospect's order of a Product is indirect, such as through another customer, including an Excluded Customer, the Approved Product's marks or association with the Product must be reasonably clear to CompoSecure in order for the Approved Prospect to be considered a Customer."[123] The draft retained the requirement that the order result from the "sales efforts" of the CardUX team.[124]

On September 14, 2015, Kleinschmidt returned a markup.[125] Among other changes, he deleted the efforts clauses and the definition of "Customer."[126] He added a sentence to Section 6.1 to clarify that sales to Approved Prospects earned commissions, even if the actual purchaser was an Excluded Customer.[127] He also made changes to the definition of "Net Sales Price."[128]

---

[122] JX 127 §§ 6.1, 6.2(e), 6.2(f)(iii).

[123] *Id.* § 1.

[124] *Id.*

[125] JX 133.

[126] *Id.* §§ 1, 6.1, 6.2(e), 6.2(f)(iii).

[127] *Id.* § 6.1.

[128] *Id.* § 1.

25

At the end of his email, Kleinschmidt proposed adding companies to the Approved Prospect list where CardUX had "extremely strong relationships but where CompoSecure has already made inroads."[129] With respect to these customers, he stated:

> We are definitely not looking to get credit for work that has been done and orders that would take place absent our efforts. But in a few cases, our relationships are so strong and longstanding, it would be a shame not to make them part of this effort. In particular, American, United, and BarclaycardUS/UK (excluding Visa Black) come to mind as situations where we are uniquely positioned to make a significant impact even though [CompoSecure] products are being offered (United, possibly American) or proposed (BarclaycardUS, excluding Visa Black). This is a secondary / non contract issue, but we wanted to raise it mainly because it seems like such a significant opportunity for both parties.[130]

Kleinschmidt reiterated this request in a later email and added that he thought CompoSecure was "making a mistake . . . [by] narrowing the sales effort we would drive, especially by excluding several of the issuers and partners where we have strong relationships."[131]

At trial, Hollin and Logan testified that they interpreted "[w]e are definitely not looking to get credit for work that has been done and orders that would take place absent our efforts" as Kleinschmidt broadly stating that CardUX only planned to take

---

[129] *Id.* at 2 (transmittal email attaching draft agreement).

[130] *Id.*

[131] JX 137 at 2 ("the only mistake I believe [CompoSecure] is making with the [CardUX] Agmt is narrowing the sales effort we would drive, especially by excluding several of the issuers and partners where we have very strong relationships.").

commissions on sales generated by its marketing efforts.[132] Logan claimed that she did not believe the paragraph was limited to the identified partners and that, in light of this sentence, CardUX would receive a commission only if it could show that an order would not have taken place absent its efforts.[133]

This testimony was not credible. The structure of the email makes clear that Kleinschmidt was identifying only "a few of the partners and issuers . . . where CompoSecure has already made inroads."[134] As Logan conceded, Kleinschmidt identified the ask as "separate and apart from what's in the contract."[135] It is not reasonable to read the email as overriding the parties' negotiations and what later became the express terms of the agreement.

On October 2, 2015, Hollin sent Kleinschmidt an "updated draft."[136] It dropped the defined term "Customer" and deleted the efforts language from Sections 6.1, 6.2(e), and 6.2(f).[137] This change ran contrary to Hollin and Logan's claim at trial that Kleinschmidt had agreed to an overarching efforts requirement. Had he done so, these clauses would

---

[132] Hollin Tr. 44; Logan Tr. 196-97.

[133] Logan Tr. 384-86.

[134] JX 133 at 2.

[135] Logan Tr. 384-86.

[136] JX 140.

[137] *See id.* §§ 1, 6.1, 6.2(e), 6.2(f).

27

have implemented the requirement, and Kleinschmidt would have had no reason to delete them.

The updated draft added language to Section 6.1 that stated, "[f]or any indirect purchases pursuant to this **Section 6.1**, the Approved Prospect's connection to the purchased Products must be reasonably clear to CompoSecure for Commissions to be payable on such purchases."[138] On October 14, 2015, Kleinschmidt objected to this language.[139] Hollin, Logan, and the management team agreed to drop it.[140]

On October 22, 2015, CompoSecure's counsel circulated a final draft.[141] It did not contain any efforts clauses, did not include a definition of Customer, and included Kleinschmidt's October 14 comments.[142]

On October 28, 2015, Logan informed Kleinschmidt that CompoSecure was taking Alaska Airlines off of the Approved Prospect list because it had requested a metal-card prototype.[143] Kleinschmidt told his team that "getting the deal done with [C]ompo . . . is the highest priority."[144] CompoSecure had exclusive control over what businesses stayed

---

[138] *Id.* § 6.1.

[139] JX 148 at 2.

[140] *Id.* at 1; *see also* JX 150.

[141] JX 151.

[142] *Id.* §§ 1, 6.1, 6.2, 11.2.

[143] JX 160 at 1.

[144] *Id.*

on the list,[145] and Kleinschmidt believed the agreement covered "a very limited list of Approved Prospects."[146] Kleinschmidt wanted to avoid losing other prospects by signing the agreement as soon as possible.

## G. The Executed Sales Agreement

On November 4, 2015, an execution version of the proposed sales agreement was circulated among the parties.[147] On November 5, Logan forwarded the agreement to her senior management team.[148]

On November 9, 2015, the sales agreement was executed.[149] The final version of the document is dated as of November 6, 2015.[150] This decision refers to it as the "Sales Agreement."

Sections 3.1 and 3.2 of the Sales Agreement specified the efforts that CardUX was required to undertake.[151] Section 3.1 stated that CardUX "shall use commercially reasonable efforts to market, advertise, promote and solicit the sale of the Products to Approved Prospects, consistent with good business practice, in an attempt to maximize

---

[145] JX 148 at 2.

[146] JX 328.

[147] PTO ¶ 43.

[148] *Id.* ¶ 46.

[149] *Id.* ¶ 47.

[150] JX 165. Citations to the Sales Agreement appear in the form "SA § __."

[151] Logan Tr. 352-53.

Product sales volume to Approved Prospects."[152] It contained eight subsections identifying discrete marketing obligations. Section 3.2 specified the efforts that CardUX had to make after a sale to an Approved Prospect. It provided that CardUX "shall use commercially reasonable efforts to maintain good business relationships with such Approved Prospects, and to keep CompoSecure apprised of material developments in such business relationships that Sales Representative becomes aware of."[153] It contained four subsections identifying discrete servicing obligations.

Section 6.1 of the Sales Agreement provided that "CompoSecure shall pay [CardUX] a commission on all sales of Products to Approved Prospects pursuant to the terms of this Agreement of fifteen percent (15%) of the Net Sales Price."[154] The Sales Agreement did not contain any provisions conditioning CardUX's receipt of a commission on a link between its efforts and the sale.

Schedule 2 of the Sales Agreement identified 119 Approved Prospects divided into eight categories:

- Twenty-three under the heading "Card Issuers."

- Twenty-two under the heading "Wealth Management/Private Banks."

- Twenty under the heading "Airlines."

- Eighteen under the heading "Hotel/Cruise Line."

---

[152] JX 165 § 3.1.

[153] *Id.* § 3.2.

[154] *Id.* § 6.1.

30

- Fourteen under the heading "Retail."

- Eight under the heading "Auto Companies."

- Seven under the heading "Travel."

- Seven under the heading "Financial Companies/Other."[155]

With the aid of a demonstrative, Frantz testified at trial that forty-eight of the Approved Prospects already had a card program with an issuing bank that was not an Approved Prospect. For seven of those programs, the issuing bank was Chase.[156]

Logan executed the Sales Agreement on behalf of CompoSecure in her capacity as CEO.[157] At the time, no one focused on pertinent approval requirements in the LLC Agreement.[158] Most significantly, Section 5.4 provided as follows:

> Notwithstanding that it may constitute a conflict of interest, each of the Members, the members of the Board and their respective Affiliates, or any other Related Party, may engage in any transaction or other arrangement (including . . . the rendering of any service . . . ), whether formal or informal, with the Company . . . , and the Company may engage in any such transaction, only if such transaction is at arm's length and approved by the Board, the Investors and the Class A Majority.[159]

This decision refers to Section 5.4 as the "Related Party Provision."

---

[155] *Id.* sched. 2.

[156] Frantz Tr. 726-27; *see also* JX 533.

[157] PTO ¶ 49.

[158] Hollin Tr. 103.

[159] LLCA § 5.4.

31

The Related Party Provision applied to the Sales Agreement because CardUX qualified as an "Affiliate" of Kleinschmidt, who was a member of the Board.[160] CardUX also qualified as a "Related Party."[161] Consequently, the Sales Agreement required the approval of the Board, the Investors, and the Class A Majority.[162]

---

[160] The LLC Agreement defines an "Affiliate" of any person "that is not a natural person" to mean "any other Person controlling, controlled by, or under common control with such particular Person, where 'control' means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise." LLCA § 1. CardUX has not disputed that it is Kleinschmidt's affiliate. It seems obvious to me that CardUX is, at a minimum, under the common control of Kleinschmidt, Frantz, and Flanagan.

[161] The LLC Agreement defines "Related Party" as "any manager, Member or officer of the Company or any Subsidiary of the Company, any Affiliate of the foregoing, and any other Person in which any of the foregoing has a direct or indirect interest (financial or otherwise)." LLCA § 1. As noted, CardUX is an Affiliate of Kleinschmidt, and Kleinschmidt was a "Member" of the Company, defined as "each Holder identified on Schedule A." *Id.* Kleinschmidt appeared on Schedule A as the holder of 1,081.97 Class B units. *Id.* sched. A.

[162] CompoSecure argues that the Sales Agreement also qualified as a "Restricted Activity" under Section 4.1(p) of the LLC Agreement. LLCA § 4.1(p). In summary, Section 4.1(p) requires that CompoSecure prepare an annual budget and annual business plan. It then provides that, except as set forth in the annual budget or business plan, the Company cannot undertake any Restricted Activity "without the prior approval of the Board and Investors (and during the Earnout Period, the Class A Majority)." *Id.* The list of eighteen "Restricted Activities" in Section 4.1(p)(ix)(A) includes, "enter[ing] into . . . any contract . . . requiring the Company . . . to make expenditures in excess of $500,000 during any fiscal year, other than in the ordinary course of business consistent with past practice." *Id.* § 4.1(p)(ix)(A). The defendants' invocation of Section 4.1(p) is cumulative. Assuming without deciding that the Sales Agreement qualified as a Restricted Activity, the analysis of the approval requirements under the Related Party Provision applies equally to the comparable requirements under Section 4.1(p).

The Sales Agreement did not receive formal approval from the Board. The Board materials presented during its meeting in July 2015 had discussed the anticipated terms of the agreement, and the Board materials presented during its meeting in December 2015 contained a slide summarizing the final Sales Agreement. The Sales Agreement itself was not provided to the Board.[163] The Board did not take formal action to approve the Sales Agreement at either meeting. Nor did the directors take action without a meeting by executing a written consent.

The Sales Agreement did not receive formal approval from the Investors. The LLC Agreement defined the "Investors" as the funds managed by LLR that held units in CompoSecure. Hollin represented the LLR funds and supported the Sales Agreement, but the record does not contain a written document, executed by a representative of LLR, reciting that LLR had approved the Sales Agreement for purpose of the LLC Agreement.

The Sales Agreement did not receive approval from a Class A Majority. The LLC Agreement defined "Class A Majority" as members holding at least 51% of the Class A Units. Logan held a majority of the Class A Units. She supported the Sales Agreement and signed it in her capacity as CEO, but the record does not contain a written document, executed by Logan, reciting that a Class A Majority had approved the Sales Agreement for purpose of the LLC Agreement.

---

[163] Hollin Tr. 47; Tartavull Tr. 1148.

Despite CompoSecure's failure to comply with the Related Party Provision, Logan signed the Sales Agreement.[164] The signature block recites that she signed on behalf of "COMPOSECURE, L.L.C."[165] It identifies her by name and lists her title as "Chief Executive Officer."[166] Moreover, in Section 11, each party to the Sales Agreement made the following representations and warranties to the other:

(a) It is duly organized, validly existing and in good standing in the jurisdiction of its formation;

(b) it has the full right, power and authority to enter into this Agreement, to grant the rights and licenses granted under this Agreement and to perform its obligations under this Agreement;

(c) the execution of this Agreement has been duly authorized by all necessary company action; and

(d) this Agreement constitutes the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally or the effect of general principles of equity (regardless of whether considered in a proceeding at law or in equity).[167]

This decision refers to these representations collectively as the "Authority Representations."

---

[164] Logan Tr. 374.

[165] JX 165 at 26 (signature page).

[166] *Id.*

[167] *Id.* § 11.1.

34

When Logan signed the Sales Agreement, she believed the Authority Representations were accurate and that she had the authority to bind CompoSecure.[168] Hollin, who represented LLR in its capacity as CompoSecure's majority owner, also believed that Logan was authorized to sign the Sales Agreement.[169] Herslow, who founded CompoSecure, had the same view.[170]

## H. The Parties Treat The Sales Agreement As Valid.

After the parties signed the Sales Agreement, both sides treated it as valid. CardUX began its marketing efforts, which CompoSecure supported by providing sample cards.[171] CompoSecure included expenditures under the Sales Agreement in its annual budget.[172] The parties also discussed changes to the list of Approved Prospects.

One potential change related to Discover, which was an Approved Prospect. On November 13, 2015, Logan learned that Discover had budgeted funds to purchase metal cards.[173] Logan informed Hollin and noted that it was a case where CompoSecure would pay 30% in total commissions, because the deal came through a personalization partner

---

[168] Logan Tr. 199, 266-67, 270; Logan Dep. 6, 8-10, 51.

[169] Hollin Dep. 163-64.

[170] Herslow Dep. 75-76.

[171] *See, e.g.*, JX 178 at 1; JX 182 at 1; JX 200 at 1; JX 217.

[172] *See* Logan Tr. 208-09, 288, 290-91.

[173] JX 173 at 3.

and Discover was an Approved Prospect.[174] Hollin and Logan debated whether CardUX would agree to swap Discover for Barclays. Logan proposed the swap to Kleinschmidt and Frantz, but they declined.[175]

The parties also negotiated over adding American Airlines to the Approved Prospect list. CompoSecure had already made inroads with American, but was unsure if American would place an order. CardUX had strong contacts there, and Logan thought CardUX could "clinch the deal," but she did not want to pay a full commission because CompoSecure had made CardUX's job "a little easier."[176] In December 2015, Logan offered to add American Airlines to the Approved Prospect list if Kleinschmidt would take a 7.5% commission.[177] Kleinschmidt agreed to the one-off amendment.[178] Both parties signed a modification adding American Airlines to the Approved Prospect list at a 7.5% commission.[179]

## I.     The Amazon Sale

Over the next six months, before CompoSecure took the position that the Sales Agreement was invalid, CardUX engaged in sales efforts with at least forty-eight

---

[174] *Id.* at 1.

[175] JX 185 at 2.

[176] JX 198.

[177] JX 200 at 2.

[178] *Id.* at 1.

[179] JX 206.

prospects.[180] Voluminous evidence in the record demonstrates the extensive marketing and sales efforts that CardUX pursued during this period.[181] CardUX's efforts with Amazon illustrate some of the marketing and sales activities that CardUX pursued and provide the factual context for the current dispute.

In November 2015, shortly after the Sales Agreement was signed, Flanagan reached out to a "good friend" at Amazon who was responsible for vendor management.[182] Flanagan told her about metal cards, CompoSecure, and the benefits to Amazon from using metal cards for its credit-card and gift-card programs. She asked her friend to "help us make the introductions with the right people."[183] In mid-December, Flanagan's friend set

---

[180] JX 426 at 1.

[181] The record from this period includes the contact reports and related documents that CardUX regularly provided to CompoSecure. *See*, *e.g.*, JX 364; JX 375; JX 391; JX 403-04; JX 408; JX 410; JX 418; JX 430. It also includes numerous emails relating to CardUX's efforts. *See*, *e.g.*, JX 367; JX 370; JX 395; JX 398; JX 401; JX 405; JX 413-14; JX 531-32. In some emails, Flanagan identified herself as representing either Vague or Kleinschmidt or the firm they used to manage their capital, Gabriel Investments. *See, e.g.*, JX 374; JX 376-77; JX 390; JX 396; JX 406; JX 409; JX 420. She believed those connections would carry more weight and get better results than CardUX. Flanagan Tr. 455-47, 531-33, 570. The CompoSecure Board received a report on CardUX's activities during its February 2015 meeting. *See* JX 372 at 19. At trial, Flanagan testified credibly and at length about the efforts that CardUX made to fulfill its obligations under the Sales Agreement.

[182] *See* JX 203; JX 218; Flanagan Tr. 453-54.

[183] Flanagan Tr. 454.

up a meeting for CardUX with the general manager of the gift-card division, who reported to the same person as the head of the credit-card division.[184]

Meanwhile, during the first week of December 2015, Kleinschmidt and Flanagan met with the principals of First Annapolis. Although the meeting was not specifically related to Amazon, First Annapolis was one of the leading industry consultants to co-brand partners, and its principals exemplified the types of industry influencers that CardUX could reach.[185] First Annapolis had advised Amazon in the past, and an image of an Amazon credit card appeared on its website.[186] During the meeting, Kleinschmidt and Flanagan promoted the benefits of metal cards and explained that a co-brand partner could push for metal cards when negotiating with an issuer.[187] The First Annapolis principals expressed interest in having their clients include requirements for metal cards in their requests for proposals ("RFPs") to issuers.[188] Kleinschmidt reported on the meeting to Logan and asked for samples to share with First Annapolis.[189]

Unbeknownst to CardUX, Amazon had already issued an RFP. During the first week of December 2015, CompoSecure received an inquiry from Bank of America about

---

[184] *See* JX 233 at 1; Flanagan Tr. 458.

[185] *See* JX 205 at 1; JX 278 at 1; Kleinschmidt Tr. 978.

[186] Kleinschmidt Tr. 980.

[187] *Id.* at 979.

[188] JX 205 at 1; JX 531 at 1; Flanagan Tr. 575.

[189] JX 205 at 1.

a potential order of "several million" metal cards.[190] Days later, Logan received a similar inquiry from Chase.[191] Logan inferred that a co-brand partner was soliciting proposals.[192] She learned that Amazon was the co-brand partner from her contact at Chase.[193]

Amazon was an Approved Prospect under the Sales Agreement. The issuing banks who were competing for the business—Bank of America and Chase—were not Approved Prospects. Immediately upon hearing about the Amazon order, Logan wrote the following to Hollin: "Yikes. Kevin and Paul would get 15%."[194] At trial, Logan and Hollin confirmed that the Amazon order met the requirements for a commission under the Sales Agreement.[195] On December 14, 2015, Logan sent an email to Hollin bemoaning the fact that CompoSecure "didn't insist on a lower commission" for Chase orders "since the whole

---

[190] Logan Tr. 210.

[191] JX 213 at 2.

[192] Logan Tr. 210.

[193] *See* JX 213; JX 214; Logan Tr. 255-56.

[194] JX 213 at 1.

[195] Hollin Tr. 85-86; Logan Tr. 379-80. Logan testified at trial that she knew at the time that CardUX would *not* earn a fee for the Amazon order if it came through Chase. Logan Tr. 174, 220-21. She attempted to re-interpret her contemporaneous emails. *See* Logan Tr. 213-15, 264. Her testimony was strained, seemed overly rehearsed, and was not credible.

point is to lower the concentration."[196] Hollin told Logan that CompoSecure should "live with the deal as agreed."[197]

After learning that Amazon was the source of the order, CompoSecure enlisted CardUX's help in steering the business to Bank of America.[198] Because Chase received volume discounts, the order would generate more revenue for CompoSecure if it came from Bank of America.[199] Kleinschmidt told Logan that CardUX would work to ensure that Amazon "requires metal cards from whatever issuer receives the new contract."[200]

CardUX advised CompoSecure that it was "mov[ing] Amazon to the top spot" on its prospect list and requested sample cards for use in upcoming meetings with Amazon personnel.[201] Using her contacts, Flanagan reached the General Manager of North America Credit Cards at Amazon, an executive of Amazon's Global Credit division, and the General Manager of Amazon Co-Branded Credit Card Programs in the US and Canada.[202]

Frantz and Flanagan met with Amazon representatives on January 26, 2016, less than a week after Chase and Amazon signed a renewed co-branding agreement that called

---

[196] JX 219; *see also* Logan Tr. 387-89.

[197] JX 226 at 1.

[198] JX 219; *see also* JX 227 at 1.

[199] Logan Tr. 257.

[200] JX 227 at 1.

[201] JX 237 at 1.

[202] *See* JX 251; JX 268 at 2-3; Flanagan Tr. 458-60.

for metal cards.[203] The evidence at trial established that CardUX's efforts did not contribute to Amazon's request for metal cards. Amazon first demanded metal cards in October 2015, before CardUX started pursuing Amazon.[204] Although Chase resisted the metal card requirement,[205] Amazon insisted,[206] and it became clear by mid-December that Chase would "be issuing a metal card."[207]

Chase and Amazon finalized the terms of their agreement, including the metal-card requirement, on January 19, 2016.[208] On January 22, Logan learned that Chase would be placing a massive order for Amazon. She called Hollin with the news.[209] She later emailed him: "Oh boy Mitchell . . . . I know that we are trying to decrease the customer concentration but it's hard to say no to 70% margin business."[210] This decision refers to Chase's order for the Amazon co-brand program as the "Amazon Sale."

_____

[203] JX 309 at 1.

[204] JX 152 § 2.3(a).

[205] *See* JX 190 § 2.3(a) (deleting metal card requirement).

[206] Garcia Tr. 486.

[207] *Id.* at 488.

[208] JX 263.

[209] Logan Tr. 220.

[210] JX 216; Logan Tr. 319.

**J.     The Dispute Over The Amazon Sale**

Logan called Kleinschmidt to convey the news about the Amazon Sale. She told him, "You hit the lottery."[211] She described the expected size of the order and estimated that "up-front the commission would be $9 million."[212] She asked Kleinschmidt "to consider taking a lower commission" and suggested that he follow up with Hollin.[213]

When Hollin and Kleinschmidt spoke, Hollin asked Kleinschmidt to consider taking a lower commission.[214] He also asked Kleinschmidt to describe what CardUX had done to generate the Amazon order.[215] On January 28, 2016, Kleinschmidt sent an email to Logan and Hollin that detailed CardUX's contacts with First Annapolis and Amazon and requested a commission for the Amazon Sale.[216]

---

[211] Kleinschmidt Tr. 966.

[212] *Id.* at 967.

[213] *Id.* at 967-98. Logan testified that she called Kleinschmidt and said that CardUX "would not be getting a commission from Chase because they [Chase] are an excluded customer. And . . . because they [CardUX] weren't involved in this." Logan Tr. 392. I reject her account and credit Kleinschmidt's. In contemporaneous emails, Logan recognized that CardUX was entitled to a commission. JX 213; JX 219. She admitted at trial that the Amazon sale met the requirements of the Sales Agreement. Logan Tr. 379-80. This was not the only instance when Logan's testimony did not hang together. Kleinschmidt's account, by contrast, was credible.

[214] Kleinschmidt Tr. 969.

[215] Hollin Tr. 53-54.

[216] JX 278. Part of Kleinschmidt's belief stemmed from his contact with First Annapolis. On January 27, 2016, one of the principals of First Annapolis sent an email to Kleinschmidt saying he gave CardUX "a big plug to a super large retailer that is on fire in

Logan forwarded the email to Herslow and the rest of CompoSecure's management team.[217] Herslow did not want to pay the commission. He posited that CompoSecure would have "a very good case with minority shareholder rights since LLR with 60% forced us to sign an agreement which we never would have signed anyway [a]nd compromised us financially."[218] At another point, he suggested that CompoSecure pay CardUX "5 percent and let them sue."[219] At trial, he admitted that his coercion claim was baseless.[220] In his deposition, Herslow admitted that he was "coming up with reasons to either invalidate the Agreement or in order to not pay CardUX's commission."[221]

On February 5, 2016, the CardUX principals met with Logan and other CompoSecure representatives.[222] Logan told Kleinschmidt that CompoSecure was not going to pay the commission.[223] She questioned whether CardUX had any role in

_____

terms of growth." JX 532. At trial, the Chase representative testified that Amazon used a consultant on its RFP, but did not reveal the consultant's identity. Garcia Tr. 473.

[217] JX 282.

[218] JX 290; *see also* JX 291 (email from Herslow asking Logan if she "would have signed the ISO contract if Mitchell hadn't ordered [her] to do it").

[219] JX 292; *see also* JX 294 at 1.

[220] Herslow Tr. 1183.

[221] Herslow Dep. at 187-89.

[222] JX 309.

[223] *Id.* at 3.

generating the Amazon Sale.[224] She also claimed that the Sales Agreement "was forced on her by LLR."[225] At trial Logan admitted that her claim about LLR forcing her to accept the Sales Agreement was "a false statement."[226] Hollin also labeled it "false."[227]

Kleinschmidt refused to compromise. He took the position that "we have a contract and [CompoSecure] would owe [CardUX] the money even if [CardUX] did nothing to earn it."[228]

Several days after the meeting, Hollin spoke again with Kleinschmidt and asked him to take a reduced commission. Hollin warned Kleinschmidt that if CardUX took "a very hard-line" and "was unreasonable," then "it would not be a happy outcome."[229] Kleinschmidt maintained that CardUX was entitled to a commission under the Sales Agreement.[230]

At this point, CompoSecure started obstructing CardUX's ability to earn more commissions. In an email dated February 12, 2016, Kleinschmidt advised Logan that CardUX had learned from "multiple sources in the industry that Disney is in the process of

---

[224] *Id.*

[225] *Id.*

[226] Logan Tr. 243-45.

[227] Hollin Tr. 125.

[228] JX 309 at 3.

[229] Hollin Tr. 57.

[230] JX 329.

conducting an RFP."[231] Kleinschmidt told Logan that he wanted to meet with Disney's consultant on the RFP and asked for Logan's approval to share samples with the consultant. Logan withheld approval, telling Kleinschmidt that "[s]ince Disney is a [Chase] client we need to resolve the way forward for any [Chase] business for co-brands on the approved prospect list."[232]

Kleinschmidt asked if this meant that CardUX should not provide samples to Disney directly. Logan turned to her senior management team for advice. Stephen Luft, the Technical Sales Vice President, told her that giving CardUX permission to approach Disney would be "digging a deeper hole until they agree to the lower percentage."[233] Justin D'Angelo, the Chief Operating Officer, said he "wouldn't give [CardUX] samples till [sic] this issue is resolved."[234] Timothy Fitzsimmons, the Chief Financial Officer, was more measured. He recognized that because CardUX "sells to affinity partners it is inevitable that they will on occasion issue through [Chase]."[235] He pointed out that CompoSecure was assuming it would get the Chase business anyway, but he thought that "[t]he theory that affinity partners can force the banks to use us makes sense" and that "[t]his is where the

---

[231] JX 346 at 3.

[232] *Id.* at 2.

[233] *Id.* at 1.

[234] JX 347 at 1.

[235] JX 350 at 1.

[CardUX] team truly can bring value."[236] He questioned whether CompoSecure should seek a carve-out for Chase business, but agreed that CompoSecure should "hold off" on supporting the Disney RFP.[237] D'Angelo responded that CompoSecure should seek a broader renegotiation of the Sales Agreement in which there would be "a differentiation made between existing co-branded [C]hase clients and future ones" and where any commission would "only be paid if they can demonstrate direct involvement."[238] Herslow wanted to "[c]ancel the [Sales Agreement] and negotiate[e] a new one."[239]

Logan instructed Kleinschmidt not to pursue Disney or any other Chase partner.[240] In March 2015, when CardUX asked to move forward with sending samples to a consultant, Logan said she would not provide samples until "we have an agreed path forward."[241] In April 2015, Logan instructed her staff "to put any further prototypes" for

---

[236] *Id.*

[237] *Id.*

[238] JX 352 at 1.

[239] JX 353 at 1.

[240] Logan Tr. 396 (Logan describing her instruction to CardUX not to talk to Disney or any approved prospect that issued its cards through Chase); *see also* JX 350 at 2; JX 438 at 1 (CompoSecure instructing CardUX not to discuss metal cards with Qantas, despite Qantas being an Approved Prospect).

[241] JX 385 at 1.

CardUX "on hold until we see some orders."[242] As a result, CardUX attended meetings with Approved Prospects without samples and support from CompoSecure.[243]

**K.    The Dispute Deepens.**

At the end of February 2015, CompoSecure proposed having Phillipe Tartavull attempt to resolve the dispute over the Amazon Sale.[244] Tartavull had joined the Board at the December 2015 meeting.[245] He spoke with Kleinschmidt and Frantz at the end of March and proposed resolving the dispute through a payment by CompoSecure of $1-1.5 million and a renegotiation of the Sales Agreement that would involve lower commissions.[246] His offer gained little traction.

To force the issue, CompoSecure hired a litigation firm and prepared for a lawsuit. In an email dated May 10, 2016, Logan instructed CardUX to stop work, stating: "As you are aware, we are continuing to evaluate the relationship between CompoSecure and you/Card UX, LLC. We are now going to pause all activities and communications with CardUX . . . ."[247] Kleinschmidt objected, noting that CompoSecure had an obligation under

---

[242] JX 415 at 1.

[243] *See* JX 426 at 1-2.

[244] *See* JX 369.

[245] JX 372 at 46; JX 518; Hollin Tr. 47.

[246] *See* JX 393; *see also* JX 426 at 1 (Kleinschmidt describing proposal); JX 429 at 1 (same).

[247] JX 426 at 2.

47

Section 4.1 of the Sales Agreement to use "commercially reasonable efforts to support the sales and servicing efforts of [CardUX] contemplated by this Agreement."[248] On May 13, 2016, LLR removed Kleinschmidt from the Board.[249]

By letter dated May 26, 2016, CompoSecure's litigation counsel asserted for the first time that the Sales Agreement had never received the approvals required by the LLC Agreement.[250] CompoSecure made that determination "shortly before [the] letter was sent."[251] Hollin and Logan had never questioned the validity of the Sales Agreement before the dispute over the Amazon Sale arose.[252]

The letter from CompoSecure's litigation counsel also accused CardUX of having breached the Sales Agreement by engaging "in numerous prohibited contacts with MasterCard, Visa and Barclays."[253] Its counsel further accused CardUX of having "ignor[ed] [CompoSecure's] reasonable directions and instructions to work in a coordinated manner."[254] By the time of trial, CompoSecure had abandoned those positions.

---

[248] *Id.* at 1.

[249] PTO ¶ 50; JX 427.

[250] JX 437; *see also* Franz Tr. 744-45; Logan Tr. 398.

[251] Logan Tr. 399.

[252] Hollin Tr. 102-03; Logan Tr. 199.

[253] JX 437 at 4.

[254] *Id.*

48

Despite making these assertions, the letter from CompoSecure's litigation counsel stated that CompoSecure expected CardUX to continue working while CompoSecure sought "a judicial determination as to the validity of the Agreement."[255] The CardUX team had, in fact, continued to reach out to prospects and pursue leads, and they continued to do so during the ensuing litigation.[256] Their efforts developed additional business for CompoSecure. In November 2016, CompoSecure recognized CardUX's efforts to market to Discover and its right to a commission from the resulting Discover order.[257] At the time of trial in June 2017, CardUX was still promoting, marketing, and soliciting sales of CompoSecure cards.[258]

## II.     LEGAL ANALYSIS

The parties approach the case from different perspectives. For CompoSecure, the dominant narrative involves its own failure to comply with the Related Party Provision, which renders the Sales Agreement invalid and any breach irrelevant. For CardUX, the

---

[255] *Id.*; *see also* JX 455 at 2 (Logan informing Members that CompoSecure had filed litigation and "will continue to manage its relationship with CardUX in a 'business as usual' manner pending the resolution of the Delaware litigation."); Frantz Tr. 744-45.

[256] *See, e.g.*, JX 315; JX 319; JX 327; JX 346; JX 374; JX 376; JX 385; JX 390; JX 392; JX 396; JX 398; JX 402; JX 406; JX 410; JX 413; JX 420; JX 430; JX 432-36; JX 439-40; JX 442; JX 444-45; JX 448-49; JX 451-53; JX 457; JX 461; JX 463; JX 466-68; JX 476; JX 481; JX 488; JX 493; JX 498; JX 503-04; JX 507. Flanagan testified extensively at trial about CardUX's continuing efforts to fulfill its obligations under the Sales Agreement after the dispute over the Amazon Sale.

[257] *See* JX 499; Logan Tr. 182-83.

[258] Flanagan Tr. 517, 639-40.

49

dominant narrative involves CompoSecure's breaches of the Sales Agreement. CardUX asserts two grounds for breach. First, CompoSecure breached Section 6.1 by failing to pay a commission for the Amazon Sale. Second, after the dispute over the Amazon Sale arose, CompoSecure breached Section 4.1 by failing to use commercially reasonable efforts to support CardUX's sales activities.

Procedurally, CompoSecure sued first, seeking a declaratory judgment that the Sales Agreement is invalid. CardUX counterclaimed for breach. Although CompoSecure is formally the plaintiff, this decision structures the analysis using CardUX's counterclaims. First, CardUX is the natural plaintiff. CompoSecure's refusal to pay a commission for the Amazon Sale and to support CardUX's activities gave rise to the dispute between the parties. The natural response would have been for CardUX to sue. Second, as part of its counterclaims, CardUX has to establish the existence of a valid contract, which is the essence of CompoSecure's claim. Because CardUX's counterclaims encompass the question of validity, they provide an orderly framework for analyzing the issues in the case.

A.      Breach of Section 6.1

In the first of its two claims for breach of contract, CardUX contends that CompoSecure breached Section 6.1 of the Sales Agreement by failing to pay commissions on the Amazon Sale. The Sales Agreement specifies that it is governed by New Jersey Law.[259] To prevail on a claim for breach of contract under New Jersey law, "a party must

---

[259] SA § 16.16. The Sales Agreement contains a forum selection provision requiring that any disputes be litigated in federal district court in New Jersey or, if that court lacks subject matter jurisdiction, a New Jersey state court sitting in Somerset County. *Id.* § 16.17.

prove a valid contract between the parties, the opposing party's failure to perform a defined obligation under the contract, and the breach caused the claimant to sustained damages."[260] To establish liability, the party need not establish a specific amount of quantifiable damages.[261] The court addresses the quantum of damages when it determines a remedy.

### 1. The Existence Of A Valid Contract

The governing New Jersey standard instructs the court to determine first whether there is a valid contract. The Sales Agreement is a detailed, written agreement, drafted initially by CompoSecure's lawyers, and negotiated by sophisticated parties with the assistance of counsel. It spans thirty-one pages. Logan signed it on behalf of CompoSecure in her capacity as CEO; Kleinschmidt signed it on behalf of CardUX. In Section 11 of the

---

CompoSecure arguably breached this provision by filing suit in this court, but CardUX waived any objection by opting to litigate here. I say "arguably" because CompoSecure's claim limited itself to the LLC Agreement, so there might be counterarguments under 6 *Del. C.* § 18-109(d). The parties have not raised those issues, and this decision intimates no view about them.

[260] *EnviroFinance Gp. LLC v. Envtl. Barrier Co., LLC*, 113 A.3d 775, 787 (N.J. Super. Ct. App. Div. 2015); *accord Sheet Metal Workers Int'l Ass'n Local Union No. 27 v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir. 2013) ("To prevail on a breach of contract claim under New Jersey law, a plaintiff must establish three elements: (1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiff's alleged damages.").

[261] *City of Trenton v. Cannon Cochran Mgmt. Servs., Inc.*, 2011 WL 3241579, at *4 (N.J. Super. Ct. App. Div. Aug. 1, 2011) ("[L]iability for breach of contract does not require proof of damage beyond the breach itself.").

Sales Agreement, both parties represented that the Sales Agreement was duly authorized and constituted a valid and binding obligation, enforceable in accordance with its terms.[262]

For purposes of establishing the existence of a contract that satisfies the traditional requirements for contract formation under New Jersey law, this would seem like an easy case. But six months after signing the Sales Agreement, four months after the Amazon Sale, and shortly after conferring with litigation counsel, CompoSecure asserted that the Sales Agreement was invalid because CompoSecure itself had failed to comply with the Related Party Provision.

CompoSecure's reliance on the LLC Agreement raises choice of law questions. Because CompoSecure's invalidity claim rests on the LLC Agreement, CompoSecure contends that validity must be evaluated under Delaware law. CardUX, by contrast, contends that New Jersey law applies. In my view, New Jersey law governs the bulk of the issues relating to validity. The exception is whether Logan had actual authority to sign the Sales Agreement, where Delaware law controls.

To determine what law applies to a breach of contract dispute, including the question of validity, Delaware follows the *Restatement (Second) of Conflict of Laws*.[263]

---

[262] SA § 11.

[263] *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017).

The first step in this approach is to "determin[e] if the parties made an effective choice of law through their contract."[264] If they did, then:

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.[265]

---

[264] *Id.*

[265] *Restatement (Second) of Conflict of Laws* § 187 (1971). The *Restatement* provides a more specific rule for contracts for the rendition of services, like the Sales Agreement. It states:

The validity of a contract for the rendition of services and the rights created thereby are determined, *in the absence of an effective choice of law by the parties*, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

*Id.* § 196 (emphasis added). Notably, the rule applies "in the absence of an effective choice of law by the parties." *Id.* cmt. c.

53

The *Restatement* creates an exception to this framework for claims challenging the validity of the choice of law provision itself, such as claims that "its inclusion in the contract was obtained by improper means, such as by misrepresentation, duress, or undue influence, or by mistake,"[266] but this exception does not extend to broader challenges to the validity of the agreement as a whole. The Delaware courts have adopted this view.[267] In the *Abry* decision, Chief Justice Strine held, while serving on this court, that an agreement's choice of law provision governed when the plaintiffs' asserted a claim for intentional fraud as a basis to invalidate an agreement.[268] The Chief Justice reached this conclusion even though the language of the choice of law provision focused solely on the contract itself. It stated: "This Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware, regardless of the Laws that might otherwise govern under applicable principles of conflicts of law."[269]

In this case, the Sales Agreement contains a choice of law provision that is broader than the provision in *Abry*. Section 16.16 of the Sales Agreement states:

> Choice of Law. This Agreement, including all exhibits, schedules, attachments and appendices attached hereto and thereto, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the Laws of the State of New Jersey, without regard to the conflict of laws provisions thereof to the extent such principles or rules

---

[266] *Id.* § 187 cmt. b.

[267] *See Abry P'rs V. L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1047 (Del. Ch. 2006) (Strine, V.C.) (applying Delaware law to intentional fraud claim).

[268] *Id.* at 1049-50.

[269] *Id.* at 1046.

would require or permit the application of the Laws of any jurisdiction other than those of the State of New Jersey.[270]

Unlike the provision in *Abry*, this provision encompasses "all matters arising out of or relating to this Agreement." That is a broader clause that easily warrants the scope of the interpretation given to the narrower choice of law clause in *Abry*.[271]

The gist of CompoSecure's objection to validity is that CompoSecure itself failed to comply with the special requirements of the Related Party Provision. That assertion boils down to a claim that Logan lacked actual authority to bind CompoSecure to the Sales Agreement. That threshold question turns on the provisions of the LLC Agreement and involves the internal affairs of CompoSecure as a Delaware limited liability company. For that reason, it is governed by Delaware law.[272]

Once that question has been answered, the choice of law provision requires that New Jersey law govern all questions of contractual validity. Whether a contract is

---

[270] SA § 16.16.

[271] *See generally* John F. Coyle, *The Canons of Construction for Choice-of-Law Clauses*, 82 Wash. L. Rev. 631, 701-03 (2017).

[272] *See Facchina v. Malley*, 2006 WL 2328228, at *3 (Del. Ch. Aug. 1, 2006) (noting that Delaware law "governs the internal affairs of a Delaware limited liability company, regardless of its place of operations" and finding that, in the absence of LLC agreement terms addressing governance of the LLC, "the default provisions of 6 *Del. C.* § 18-402" controlled); *Kronenberg v. Katz*, 872 A.2d 568, 589 (Del. Ch. 2004) (Strine, V.C.) (noting that once parties had formed a Delaware limited liability company, "Delaware law would govern their relations with each other (i.e., the internal affairs of the organization they created, the fiduciary duties owed to the members, and the contractual rights of the parties to the LLC Agreement)"). *See generally* Robert L. Symonds, Jr. & Matthew J. O'Toole, *Delaware Limited Liability Companies* § 4.09[E] (2012 Supp.).

nevertheless valid and can be enforced against a counterparty on the facts of a given case, even if the agent who signed the contract lacked actual authority, raises substantive questions of contract law and implicates doctrines under agency law that go beyond actual authority. In light of the choice of law provision in the Sales Agreement, New Jersey law governs those questions.

The interplay between New Jersey and Delaware law likewise raises questions about the allocation and quantum of the burden proof. Here too, Delaware follows the *Restatement*,[273] which provides the following rule of decision:

> The forum will apply its own local law in determining which party has the burden of persuading the trier of fact on a particular issue unless the primary purpose of the relevant rule of the state of the otherwise applicable law is to affect decision of the issue rather than to regulate the conduct of the trial. In that event, the rule of the state of the otherwise applicable law will be applied.[274]

This court has held that allocating the burden of proof relates to the conduct of the trial and presentation of the case, such that the law of the forum should apply.[275] "But the question of *what* the burden of proof is typically constitutes a policy judgment designed to affect the outcome of the court's decision on the merits."[276] Consequently, when parties choose

---

[273] *See In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 53 (Del. Ch. 2001) (Strine, V.C.).

[274] *Restatement (Second) of Conflict of Laws* § 133.

[275] *See IBP*, 789 A.2d at 53 ("The question of which party has the burden of proof may be seen as purely procedural." (emphasis omitted)).

[276] *Id.*

the law of a particular forum to govern their relationship, they opt for the substantive

burden of proof—*e.g.*, preponderance of the evidence, clear and convincing evidence,

proof beyond a reasonable doubt—that would apply under the law of that jurisdiction.[277]

As the plaintiff asserting a claim for breach of contract, CardUX ordinarily would

bear the burden of proof on the question of validity.[278] Procedurally, CompoSecure's pre-

emptive claim for a declaratory judgment changed matters, because CompoSecure thereby

assumed the burden of proving invalidity.[279] But in response to CompoSecure's suit,

CardUX invoked the affirmative defense of ratification, where it bears the burden of

proof.[280] To harmonize these competing burdens, this decision approaches the evidence as

---

[277] *Id.*

[278] *See e.g.*, *EnviroFinance*, 113 A.3d at 787; *Cumberland Cty. Improvement Auth. v. GSP Recycling Co., Inc.,* 818 A.2d 431, 442 (N.J. Super. Ct. App. Div. 2003) (stating that a party claiming damages bears "the burden of proof to establish all elements of its cause of action, including damages").

[279] *See San Antonio Fire & Police Pension Fund v. Amylin Pharm., Inc.*, 983 A.2d 304, 316 n.38 (Del. Ch. 2009) ("Because Amylin seeks a declaratory judgment as to its right to approve, it bears the burden of proof here."); *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 739 (Del. Ch. 2008) ("[T]he better view is that a plaintiff in a declaratory judgment action should always have the burden of going forward."); 26 C.J.S. *Declaratory Judgments* § 157 (2017) ("The plaintiff in an action for a declaratory judgment normally has the burden of proving by a preponderance of the evidence that conditions exist which justify an award of declaratory relief. The plaintiff must prove his or her case in accordance with the general rules even if a negative declaration is sought." (internal citations omitted)).

[280] *See Yiannatsis v. Stephanis*, 653 A.2d 275, 280 (Del. 1995) (placing the burden of establishing ratification under Delaware law on the party asserting it); *InteInet Int'l Corp. v. ITT Corp.*, 2006 WL 2192030, at \*14 (N.J. Super. Ct. App. Div. Aug. 4, 2006) (placing the burden of establishing ratification under New Jersey law on the party asserting it).

if CompoSecure bore the burden of proof on the initial question of invalidity, but treats CardUX as bearing the burden to prove ratification. Fortunately, under New Jersey law, the quantum of proof is a preponderance of the evidence.[281] This simplifies matters, because when that standard applies, the burden of proof only comes into play when the evidence is in equipoise.[282] In this case, the evidence on validity is not in equipoise, and I would make the same factual findings regardless of which party bore the burden of proof.[283]

### a.   Logan Lacked Actual Authority.

Logan signed the Sales Agreement on behalf of CompoSecure in her capacity as CEO. "When a representative seeks to bind an entity to a contract, ordinary principles of agency law come into play."[284]

> [I]f a principal holds out a person and places him in such a position in the community that he is apparently authorized to deal with persons as the agent

---

[281] *Totaro, Duffy, Cannova and Co., LLC v. Lane, Middleton & Co., LLC*, 921 A.2d 1100, 1108 (N.J. 2007).

[282] *See in re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 792 (Del. Ch. 2011) (Strine, C.) (explaining that when the burden of proof is a preponderance of the evidence, "the burden becomes relevant only when a judge is rooted on the fence post and thus in equipoise"), *aff'd sub nom. Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012).

[283] At the end of the trial, to provide a framework for post-trial briefing, I instructed the parties to proceed as if CardUX had the burden of proof on its claim for breach of the Sales Agreement and CompoSecure had the burden of proving invalidity under the LLC Agreement. This approach facilitated a *seriatim* briefing schedule. The more thorough discussion here for purposes of rendering a decision supersedes my post-trial allocation for purposes of briefing.

[284] *ESG Capital P'rs II, LP v. Passport Special Opportunities Master Fund, LP*, 2015 WL 9060982, at *12 (Del. Ch. Dec. 16, 2015); *see Penington v. Commonwealth Hotel Constr. Corp.*, 156 A. 259, 262 (Del. Ch. 1931) (Wolcott, C.).

of the company or person, without any known restriction or limitation upon his authority, he may be so held out as to bind the principal. And the courts in this state have well said that, if a person is held out to third persons or to the public at large by his principal as having a general authority to act for him in a particular business or employment, he cannot limit his authority by private or secret instructions.[285]

"But if an agent's authority is limited and the counterparty knows about the limitations, then the agent cannot bind the principal beyond the scope of its authority."[286]

In this case, the Related Party Provision limited the ability of any agent to bind CompoSecure to a transaction falling within its scope. It provides that CompoSecure can "engage in any transaction or other arrangement (including . . . the rendering of any service . . .)" with a Related Party or with an Affiliate of a member of the Board "only if such transaction is at arm's length and approved by the Board, the Investors and the Class A Majority."[287] The Related Party Provision applied to the Sales Agreement, because CardUX qualified as an Affiliate of Kleinschmidt, who was a member of the Board. Consequently, CompoSecure could enter into the Sales Agreement only with the approval

---

[285] *Excelsior Ref. Co. v. Murphey*, 73 A. 1040, 1040 (Del. Super. 1906); *accord In re Mulco Prods., Inc.*, 123 A.2d 95, 106 (Del. Super.), *aff'd sub nom. Mulco Prods., Inc. v. Black*, 127 A.2d 851 (Del. 1956).

[286] *ESG Capital*, 2015 WL 9060982, at *12; *see Cohen v. Home Ins. Co.*, 97 A. 1014, 1017 (Del. Super. 1916) ("No rule is better settled than where a limitation on the power of an agent is brought home to the person dealing with him, such person relies upon any act in excess of such limited authority at his peril." (internal quotation marks omitted) (quoting *Egan v. Ins. Co.*, 42 P. 611, 613 (Or. 1895))), *aff'd*, 111 A. 264 (Del. 1920); *see also State v. Edwards*, 1995 WL 44267, at *4 (Del. Super. Jan. 31, 1995); *Arthur Jordan Piano Co. v. Lewis*, 154 A. 467, 469 (Del. Super. 1930).

[287] LLCA § 5.4.

of the Board, the Investors, and the Class A Majority. The Sales Agreement did not receive formal approval from the Board, the Investors, or the Class A Majority. As a result, Logan did not have actual authority to enter into the Sales Agreement.

CardUX responds by arguing that formal approval was not necessary. That is incorrect; the LLC Agreement requires formal action. The Related Party Provision requires Board approval and two member-level approvals (the Investors and the Class A Majority). Section 4.1(k) specifies that the Board can take action either (i) at a meeting, at which "at least three (3) members of the Board" must be present to "constitute a quorum for the transaction of business," or (ii) "by written consent of the members of the Board required for approval of such decision, with at least ten (10) days' prior written notice thereof to all other members of the Board."[288] Section 3.4 provides that members can take action either at a meeting or through action by written consent.[289] Neither the Board nor the members took formal action in this case.

CardUX argues that, despite Logan's lack of actual authority, CardUX could rely on Logan's signature on the Sales Agreement pursuant to Section 4.1(j) of the LLC Agreement. It states:

> Reliance by Third Parties. Any Person dealing with the Company, other than a Member, may rely on the authority of the Board (or any Officer authorized by the Board) in taking any action in the name of the Company without inquiry into the provisions of this Agreement or compliance herewith, regardless of whether that action actually is taken in accordance with the

---

[288] LLCA § 4.1(k).

[289] *Id.* §§ 3.4(b)-(d).

60

provisions of this Agreement. Every agreement, instrument or document executed by the Board (or any Officer authorized by the Board) in the name of the Company with respect to any business or property of the Company shall be conclusive evidence in favor of any Person relying thereon or claiming thereunder that . . . such agreement, instrument or document was duly executed according to this Agreement and is binding upon the Company and . . . the Board or such Officer was duly authorized and empowered to execute and deliver such agreement, instrument or document for and on behalf of the Company.[290]

This decision refers to this section as the "Third Party Reliance Provision."

CompoSecure contends that CardUX cannot rely on the Third Party Reliance Provision because of its affiliation with Kleinschmidt. Assuming for purposes of analysis that CardUX could invoke the provision, it only enables a party to rely "on the authority of the Board (or any Officer authorized by the Board)" and to treat as valid any agreement "executed by the Board (or any Officer authorized by the Board)." CardUX has not cited any "authority of the Board" on which it relied, and the Sales Agreement was not "executed by the Board." Logan authorized and executed the Sales Agreement as CEO, and CardUX relied on her signature. Therefore, the question becomes whether Logan was "authorized by the Board" to execute the Sales Agreement.

The record does not contain any document in which the Board formally authorized Logan to execute the Sales Agreement. To establish that Logan had authority, CardUX observes that, before LLR invested in May 2015, Logan effectively ran CompoSecure by

---

[290] *Id.* § 4.1(j).

herself and had authority to execute all contracts.[291] That is true, but irrelevant. As part of the LLR investment, the parties entered into the LLC Agreement, which contained the Related Party Provision. The LLC Agreement changed the rules.

Anticipating this, CardUX argues that the Board reaffirmed Logan's authority by approving a matrix titled "Delegation of Authority" in July 2015.[292] The matrix vested Logan with "Unlimited Authority for all budgeted expenditures" under the heading "Non-Manufacturing Spend."[293] Logan testified that "the matrix reaffirmed the way the Company was managed before LLR bought in"[294] and was intended to give management broad discretion.[295] By its terms, however, the delegation matrix did not confer authority on Logan to enter into the Sales Agreement, because expenditures under the Sales Agreement were not budgeted for 2015. CompoSecure prepared its budget for 2015 at the end of 2014, and that budget did not contemplate the execution of the Sales Agreement. The budget for 2016 did contain items related to the Sales Agreement, but that budget post-dated the execution of the Sales Agreement and could not have provided actual authority for Logan

---

[291] Logan Tr. 283.

[292] *See* PTO ¶ 33.

[293] JX 100 at 25.

[294] Logan Dep. 71-72.

[295] *See* JX 89 at 2; Logan Tr. 286-87; Fitzsimmons Dep. 185-88.

to sign the Sales Agreement in November 2015.[296] Logan lacked actual authority to bind CompoSecure when she executed the Sales Agreement.

CardUX knew about the limitations on Logan's authority. Kleinschmidt was a party to the LLC Agreement as a direct signatory,[297] as a member,[298] and as a manager.[299] In each capacity, Kleinschmidt is deemed to have known about the Related Party Provision and its implications for Logan's ability to enter into the Sales Agreement. Moreover, Section 12.11 of the LLC Agreement expressly states that "[b]y executing this Agreement, each member acknowledges that it has actual notice of . . . all of the provisions hereof . . . ."[300] At trial, Kleinschmidt testified that he never read the LLC Agreement and had not known about the Related Party Provision.[301] That testimony was credible, but a failure to read a contract

---

[296] *See* Logan Tr. 208-09.

[297] Before LLR's investment closed, Kleinschmidt executed the signature page for the LLC Agreement. JX 56 at 1.

[298] Kleinschmidt was a member of CompoSecure. *See* LLCA sched. A (listing Kleinschmidt on Schedule A as a member holding 1,081.97 Class B units). Because he was a member, Kleinschmidt is deemed to be a party to the LLC Agreement. *See* 6 *Del. C.* § 18-101(7) ("A member . . . of a limited liability company . . . is bound by the limited liability company agreement whether or not the member . . . executes the limited liability company agreement.").

[299] As a member of the Board, Kleinschmidt was a manager. *See* LLCA § 4.1. Because he was a manager, Kleinschmidt is deemed to be a party to the LLC Agreement. *See* 6 *Del. C.* § 18-101(7) ("A . . . manager of a limited liability company . . . is bound by the limited liability company agreement whether or not the . . . manager . . . executes the limited liability company agreement.").

[300] LLCA § 12.11.

[301] Kleinschmidt Tr. 894-97. As he explained, he wanted to receive the same membership rights as LLR, and as long as that was true, he was not particularly interested

63

does not justify its avoidance.[302] When negotiating and ultimately executing the Sales Agreement, Kleinschmidt acted as an agent of his principal, CardUX. Kleinschmidt's knowledge of the limitations on Logan's authority is therefore imputed to CardUX.[303]

In sum, the Related Party Provision limited Logan's authority to act on behalf of CompoSecure. CardUX knew of that limitation by virtue of Kleinschmidt's knowledge. The Sales Agreement was therefore unauthorized.

---

in spending the time to parse through a lengthy agreement. *Id.* Logan did not parse through the agreement carefully either. Logan Tr. 266-70.

[302] *See, e.g.*, *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 477 (Del. 1991) ("A party to a contract cannot silently accept its benefits, and then object to its perceived disadvantages, nor can a party's failure to read a contract justify its avoidance.") (quoting *Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 913 (Del. 1989)); *W. Willow–Bay Court, LLC v. Robino–Bay Court Plaza, LLC*, 2009 WL 3247992, at *4 n.19 (Del. Ch.) ("'[F]ailure to read a contract provides no defense against enforcement of its provisions where the mistake sought to be avoided is unilateral and could have been deterred by the simple, prudent act of reading the contract.'" (quoting 27 *Williston on Contracts* § 70.113 (4th ed. 2009))), *aff'd*, 985 A.2d 391 (Del. 2009) (ORDER).

[303] *See ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at *15 (Del. Ch. May 16, 2012) ("This basic principle of agency law applies with equal force to LLCs. Eric acted on behalf of the Scion LLC members in his capacity as Scion's Executive Vice President and General Counsel. Eric's knowing silence and intent are imputed to them."), *rev'd in part on other grounds*, 68 A.3d 665 (Del. 2013); *B.A.S.S. Gp., LLC v. Coastal Supply Co., Inc.*, 2009 WL 1743730, at *7 n.72 (Del. Ch. June 19, 2009) ("Delaware courts consistently have imputed to a corporation the knowledge of an officer or director of the corporation when acting on its behalf."); *Teachers' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006) (Strine, V.C.) ("[I]t is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation.").

### b. Voidable, Not Void

As CompoSecure sees it, Logan's lack of actual authority at the time of signing renders the Sales Agreement void and ends the analysis. That is not correct. Delaware law distinguishes between void and voidable acts. Void acts are those the entity itself "has no implicit or explicit authority to undertake or those acts that are fundamentally contrary to public policy."[304] Stated differently, they are acts that the entity lacks the power or capacity to effectuate.[305] Voidable acts are within the power or capacity of an entity, but were not properly authorized or effectuated by the representatives of the entity.[306] Voidable acts can be validated by equitable defenses, such as ratification and acquiescence.[307]

In this case, CompoSecure had the capacity and power to enter into the Sales Agreement. Section 18-106(b) of the Delaware Limited Liability Company Act (the "LLC Act") recognizes that a duly formed LLC is a legally distinct entity that

> shall possess and may exercise all the powers and privileges granted by this
> chapter or by any other law or by its liability company agreement, together

---

[304] *Solomon v. Armstrong*, 747 A.2d 1098, 1114 (Del. Ch. 1999).

[305] *See generally Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 648-653 (Del. Ch. 2013) (discussing the concepts of corporate power and capacity for the analogous corporate doctrine of *ultra vires*).

[306] *See generally id.*

[307] *See Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014) (holding that voidable act was "properly subject to equitable defenses" and finding that challenge was "barred by the doctrine of acquiescence"); *Michelson v. Duncan*, 407 A.2d 211, 219 (Del. 1979) ("[V]oidable acts are susceptible to cure by shareholder approval while void acts are not."). *See generally Nevins v. Bryan*, 885 A.2d 233 (Del. Ch.) (holding that the challenged actions were voidable and that the plaintiff's challenge was barred by equitable defenses), *aff'd*, 884 A.2d 512 (Del. 2005).

with any powers incidental thereto, including such powers and privileges as are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the limited liability company.[308]

This grant of authority necessarily includes the power to enter into contracts.[309] Section 18-107 of the Delaware LLC Act goes a step further and expressly grants LLCs the power to enter into interested transactions:

> Except as provided in a limited liability company agreement, a member or manager may . . . transact . . . business with[] a limited liability company and, subject to other applicable law, has the same rights and obligations with respect to any such matter as a person who is not a member or manager.[310]

CompoSecure's LLC Agreement implements these grants of authority. Section 2.6 of the LLC Agreement states:

> Purposes and Powers. The nature of the business or purposes to be conducted or promoted by the Company is to engage in any lawful act or activity for which limited liability companies may be organized under the Act. The Company may engage in any and all activities necessary, desirable, or incidental to the accomplishment of the foregoing. Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by law to a limited liability company organized under the laws of the state of Delaware. Subject to the provisions of this Agreement, the Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to or for the furtherance of the purposes set forth in this Section 2.6.[311]

---

[308] 6 *Del. C.* § 18-106(b).

[309] *See* Symonds & O'Toole, *supra*, § 2.08 (describing implied powers of an LLC, including the "power to make and enter into contracts").

[310] 6 *Del. C.* § 18-107.

[311] LLCA § 2.6.

This specification of authority necessarily includes the power to enter into contracts. Moreover, the Related Party Provision contemplates that CompoSecure has the power and capacity to enter into interested transactions, and it establishes procedural requirements for the valid exercise of the power and authority that the entity otherwise possesses.[312]

Because CompoSecure had the power to enter into the Sales Agreement and could have done so if the proper approvals had been obtained, the Sales Agreement is voidable, not void. The lack of authority that otherwise renders the Sales Agreement unenforceable is therefore subject to being cured by equitable defenses such as ratification.

### c. Ratification

CardUX contends that CompoSecure ratified the Sales Agreement. CardUX does not invoke entity-based principles of ratification, which would involve one or more decision makers at CompoSecure formally making the decisions necessary to authorize the Sales Agreement.[313] In my view, a claim of formal ratification would implicate the internal affairs doctrine and be governed by Delaware law. Rather, CardUX invokes the agency-based doctrine of implied ratification, or ratification by acquiescence, recognized by New

---

[312] *See Carsanaro*, 65 A.3d at 651-52 (explaining distinction between existence of corporate capacity or power and the duly authorized exercise of that power by the relevant corporate actor).

[313] *See Gantler v. Stephens*, 965 A.2d 695, 713 (Del. 2009) (describing the doctrine of "classic ratification").

67

Jersey law, and which New Jersey courts have applied to validate contracts that otherwise were not properly approved by an entity.[314]

Under New Jersey law, "[i]t is well established that binding ratification of an unauthorized contract by a corporation 'will be implied from acquiescence or the acceptance of the benefits of such contract; it being essential to implied ratification that it and the acceptance of benefits be with knowledge of the facts.'"[315] "Since it is the formation of the contract with which the doctrine of ratification is concerned, it is the principal's acceptance of the existence of the contract that is dispositive, not its acceptance of benefits thereunder. The latter circumstance is merely probative of the former, i.e., evidence from which approval can be implied."[316] "It is also well established that silence on the part of the corporation, i.e., failure to disaffirm the unauthorized act of its agent within a reasonable time, will under certain circumstances amount to the acquiescence from which ratification will be implied."[317] "The circumstances in which silence will amount to ratification are those where, 'according to the ordinary experience and habits of men, one

---

[314] *See, e.g.*, *Johnson v. Hospital Serv. Plan of N.J.*, 135 A.2d 483, 486-87 (N.J. 1957) (applying doctrine of implied ratification to contract with municipal corporation and collecting earlier cases); *Am. Photocopy Equip. Co. v. Ampto, Inc.*, 198 A.2d 469, 473 (N.J. Super. Ct. App. Div. 1964) (applying doctrine of implied ratification to license agreement initially signed by corporate officer without proper authority).

[315] *Am. Photocopy*, 198 A.2d at 473 (quoting *Feist & Feist v. A. & A. Realty Co.*, 145 A. 478, 479 (N.J. 1929)).

[316] *Id.* at 473-74.

[317] *Id.* at 474.

68

would naturally be expected to speak if he did not consent.'"[318] "One of the most important of such circumstances is full knowledge of the nature and extent of the unauthorized act."[319]

In this case, after executing the Sales Agreement, CompoSecure accepted the existence of the contract and treated it as valid and binding. CompoSecure did so through its interactions with CardUX and by accepting the benefits of CardUX's extensive efforts to perform under the Sales Agreement.[320] CompoSecure also recognized the existence of the Sales Agreement by approaching CardUX about changes to the Approved Prospect list as if the Sales Agreement was binding.[321] CompoSecure and CardUX agreed to add one company to the Approved Prospect list in order to enlist CardUX's help in closing the deal.[322] These acts involved CompoSecure both accepting the Sales Agreement as binding and accepting the benefits of the contract in the form of performance by CardUX.

---

[318] *Id.* (quoting *Restatement (Second) of Agency* § 94 (1958)); *see also Thermo-Contr. Corp. v. Bank of N.J.*, 354 A.2d 291, 296 (N.J. 1976) (finding ratification by acquiescence where unauthorized endorsements on checks were identified in November 1971 but no objection was made until May 1972); *Ajamian v. Schlanger*, 89 A.2d 702, 704 (N.J. Super. Ct. App. Div. 1952) ("Since this plaintiff, with full knowledge of the alleged fraud, continued for more than six months to deal with the property as his own, and made the monthly payments on the purchase price, his actions afford plenary evidence of an election to abide by the contract; and once made, this election is irrevocable.").

[319] *Am. Photocopy*, 198 A.2d at 474.

[320] *See, e.g.*, JX 364; JX 372 at 18; JX 375; JX 391; JX 403-04; JX 408; JX 410; JX 418; JX 430.

[321] *See* JX 173 at 1 (Discover); JX 185 at 1 (same); JX 200 at 1 (American Airlines); JX 205 at 1 (same); JX 206 (same); Logan Tr. 302-04 (Discover).

[322] JX 198 (American Airlines).

Internally, CompoSecure also accepted the existence of the contract. CompoSecure included amounts in its budget for 2016 to reflect expenses contemplated by the Sales Agreement.[323] Although Logan "did not expect to see any significant business in [2015],"[324] she expected that sales to Approved Prospects would hit "$5 million in revenues over the four years."[325] She treated the Sales Agreement as valid and binding.

CompoSecure specifically accepted the existence of the contract and treated it as valid and binding for purposes of events relating to Amazon. After hearing about Amazon's RFP, Logan observed that the order would trigger a commission under the Sales Agreement,[326] and she asked CardUX to use its influence to steer the business to Bank of America, rather than Chase.[327] When the Amazon Sale materialized through Chase, Logan viewed the order as triggering a commission and sought to negotiate a compromise with CardUX.[328] When the initial disagreement hardened into a dispute, a series of CompoSecure representatives sought to renegotiate the terms of Sales Agreement.[329] At each stage, CompoSecure treated the Sales Agreement as valid and binding.

---

[323] *See* Logan Tr. 208-09, 288, 290-91; Fitzsimmons Dep. 160-63; Logan Dep. 67.

[324] Logan Tr. 288.

[325] *Id.* at 293.

[326] *See* JX 213 at 1; JX 219.

[327] JX 219; *see also* JX 227 at 1.

[328] JX 219 at 1; Kleinschmidt Tr. 966-69; Logan Tr. 220-21, 316.

[329] *See* JX 309 at 2-3 (notes from meeting between CardUX principals and CompoSecure senior management); JX 393 (Tartavull's efforts); Hollin Tr. 53-54

70

It was not until May 26, 2016, in a letter sent by its litigation counsel, that CompoSecure took the position that the Sales Agreement had not been properly authorized.[330] Even then, CompoSecure continued to treat the Sales Agreement as valid and accepted the benefits of CardUX's continuing marketing efforts. In doing so, CompoSecure seemingly relied on a provision which states that "[i]f either Party disputes any amounts allegedly payable under this Agreement," then "each Party shall continue performing its obligations during any such dispute."[331] In my view, that section speaks to disputes over the amount of a payment, not a contention that the Sales Agreement as a whole is invalid. While the parties were arguing over the amount of the commission, that section applied, but once CompoSecure escalated matters and took the position that the Sales Agreement was void, the issue had grown beyond a dispute over payment.[332] By the

(describing call with Kleinschmidt); Hollin Tr. 56-57 (describing further negotiations over dispute); Kleinschmidt Tr. 967-69 (describing calls with Logan and Hollin).

[330] JX 437; *see also* Logan Tr. 398.

[331] SA § 6.3(b).

[332] *See* Logan Tr. 319-20 ("[T]he whole point of this litigation is to find out whether it's valid or not.").

71

time of trial, CompoSecure had received the benefits of nearly two additional years of marketing efforts,[333] and those efforts generated additional business for CompoSecure.[334]

On the facts of this case, CompoSecure's conduct ratified the Sales Agreement. In reaching this conclusion, I also have considered that, during the negotiation of the Sales Agreement and at the time of signing, all of the significant actors believed that the Sales Agreement was valid and binding. Hollin and Logan, who led the negotiations for CompoSecure, believed they were working on a valid agreement and wanted to enter into it.[335] During the negotiations, they provided updates to other members of the Board, none of whom raised objections to the validity of the agreement.[336] Just before signing the Sales Agreement, CompoSecure's lawyers sent the final draft to Logan and Hollin.[337] Logan forwarded it to Herslow and the rest of the senior management team.[338] No one raised concerns about its validity.

---

[333] *See, e.g.*, JX 315; JX 319; JX 327; JX 346; JX 374; JX 376; JX 385; JX 390; JX 392; JX 396; JX 398; JX 402; JX 406; JX 410; JX 413; JX 420; JX 430; JX 432-36; JX 439-40; JX 442; JX 444-45; JX 448-49; JX 451-53; JX 457; JX 461; JX 463; JX 466-68; JX 476; JX 481; JX 488; JX 493; JX 498; JX 503-04; JX 507.

[334] *See* JX 499; Logan Tr. 182-83.

[335] *See* JX 148; JX 156 at 1; Logan Dep. 59.

[336] *See* JX 39, JX 48; JX 51; JX 95-96; JX 149; Logan Tr. 274-75, 347-48; Fitzsimmons Dep. 139-42; Hollin Dep. 122-26, 163-64.

[337] JX 164.

[338] *Id.*

After Logan signed, the Board received a presentation during its December 2015 meeting that included a slide about the Sales Agreement. Although the Board did not formally approve the Sales Agreement, there is no contemporaneous evidence indicating that any director thought the Sales Agreement was invalid or opposed entering into it. Tartavull, who was a new director at the time, testified that he would have opposed the Sales Agreement if he had fully understood its terms.[339] He had not read the Sales Agreement and only knew what was in the slide, which incorrectly described the termination provision as a right to terminate on thirty days' notice, rather than as a right to terminate for breach with a cure period of thirty days.[340] The slide was drafted by Fitzsimmons, approved by Logan, presented by Luft, and discussed at the meeting.[341] Given the otherwise unanimous support for the Sales agreement, I doubt that Tartavull actually would have opposed it had he known more at the time. Even accepting his testimony, a Board majority comprising the three directors other than Kleinschmidt still supported it.

From the standpoint of equity, it is relevant that a majority of the Board, excluding Kleinschmidt, supported the Sales Agreement. If someone had flagged the Related Party Provision at the time, the disinterested members of the Board would have given the

---

[339] Tartavull Tr. 1162-63.

[340] JX 197 at 19.

[341] Hollin Tr. 48-50; Logan Tr. 202, 277-79; Kleinschmidt Tr. 1064.

necessary approval. The member-level approvals would have followed. Logan controlled the vote of the Class A members,[342] and she supported the Sales Agreement.[343] Hollin represented the investor members,[344] and he supported the Sales Agreement as well.[345]

In my view, it is also relevant for purposes of ratification that the Sales Agreement contained the Authority Representations, in which CompoSecure represented that the Sales Agreement was valid and binding. CompoSecure argues that CardUX could not have reasonably relied on those representations because the LLC Agreement contained the Related Party Provision. Given how the parties were aligned at the time, I do not think it is reasonable to expect CardUX to have assumed the burden of ensuring that CompoSecure supplied the proper internal approvals. Kleinschmidt and Frantz had been negotiating at arm's length with Logan and Hollin. CompoSecure's outside counsel prepared the initial draft of the Sales Agreement, which included the Authority Representations. If anyone should have ensured that CompoSecure took the necessary action to make the Authority Representations accurate, it was Logan, Hollin, and CompoSecure's counsel.

---

[342] PTO ¶ 22.

[343] Logan Tr. 271-72 (testifying that she signed the Sales Agreement because she believed it "was in the best interests of the company" and the Class A unitholders); *see also* JX 169 at 1; Logan Dep. 59.

[344] Hollin Tr. 106-07.

[345] *See* JX 140 at 1; JX 172 at 1; Hollin Tr. 41-42, 125; *see also* Logan Tr. 244 (describing Hollin's support for the Sales Agreement).

74

In an effort to defeat ratification, CompoSecure argued that it could not have known that CardUX would interpret the Sales Agreement to require a commission on all sales to Approved Prospects, regardless of whether CardUX played a role in generating the specific sale.[346] This argument advances a version of CompoSecure's primary theory of contract interpretation, which is addressed below. As discussed in that context, the evidence convinces me that CardUX made its position clear to CompoSecure throughout the negotiations, and CompoSecure accepted that position in the final Sales Agreement. Setting that finding aside, the analysis for purposes of ratification turns on whether CompoSecure treated the Sales Agreement as valid and accepted its existence. Whether the parties later disputed its meaning is not relevant to that question. CompoSecure had full knowledge of the Sales Agreement and its terms during the entire time when CompoSecure acted as if the Sales Agreement was valid.

On the facts of this case, CompoSecure's actions were sufficient to ratify the Sales Agreement and render it enforceable against CompoSecure under New Jersey law. The record at trial supports the existence of a valid and binding contract. The first element of CardUX's claim for breach is satisfied.

### 2.    The Opposing Party's Failure To Perform A Defined Obligation

For CardUX to prevail on its claim for breach of contract under New Jersey law, the evidence at trial must establish that CompoSecure failed to perform a defined obligation.

---

[346] Dkt. 151 at 13.

In this case, the evidence at trial established that CompoSecure had an obligation to pay a commission for the Amazon Sale, which CompoSecure refused to perform.

Under New Jersey law, the "polestar of contract construction is to discover the intention of the parties as revealed by the language used by them."[347] "Where the terms of a contract are clear and unambiguous[,] there is no room for interpretation or construction and the courts must enforce those terms as written."[348] "[T]he terms of the contract must be given their plain and ordinary meaning."[349] A court will "endeavor to give effect to all of a contract's provisions. Such an interpretation 'will be preferred to one which leaves a portion of the writing useless or inexplicable.'"[350] "A contract is ambiguous if its terms are 'susceptible to at least two reasonable alternative interpretations,' or when it contains conflicting terms."[351]

---

[347] *Karl's Sales & Serv., Inc. v. Gimbel Bros., Inc.*, 592 A.2d 647, 650 (N.J. Super. Ct. App. Div. 1991).

[348] *J.L. Davis & Assocs. v. Heidler*, 622 A.2d 923, 926 (N.J. Super. Ct. App. Div. 1993) (citations omitted).

[349] *Schor v. FMS Fin. Corp.*, 814 A.2d 1108, 1112 (N.J. Super. Ct. App. Div. 2002) (quoting *Nester v. O'Donnell*, 693 A.2d 1214, 1220 (N.J. Super. Ct. App. Div. 1997)).

[350] *Leary v. Pepperidge Farm, Inc.*, 2009 WL 2426345, at *9 (N.J. Super. Ct. App. Div. Aug. 10, 2009) (internal citation omitted) (quoting *Prather v. Am. Motorist Ins. Co.*, 67 A.2d 135, 138 (N.J. 1949)).

[351] *Woodhaven Lumber & Millwork, Inc. v. Monmouth Design & Dev. Co., Inc.*, 2014 WL 1326994, at *6 (N.J. Super. Ct. App. Div. Apr. 4, 2014) (citation omitted) (quoting *Nester*, 693 A.2d at 1220).

### a. The Obligation To Pay A Commission

The plain language of the Sales Agreement entitles CardUX to a commission for the Amazon Sale. Section 6.1 of the Sales Agreement states:

> Subject to **Section 6.2**, CompoSecure shall pay Sales Representative a commission on all sales of Products to Approved Prospects pursuant to the terms of this Agreement of fifteen percent (15%) of the Net Sales Price (the "**Commission**"). Notwithstanding anything to the contrary in this Agreement, for all purposes under this Agreement, a sale of Products shall be deemed to be a sale of Products to an Approved Prospect if (without duplication of sales): (a) a Non-Issuer Prospect purchases Products directly or indirectly from CompoSecure, (b) an Issuer purchases Products directly or indirectly from CompoSecure on its own behalf, or (c) any other Person (including an Issuer Prospect, a Personalization Partner or an Excluded Customer) purchases Products directly or indirectly from CompoSecure on behalf of, for the benefit of, pursuant to a contract with, or bearing the trademarks or other identifiable marks of, an Approved Prospect.[352]

Schedule 2 of the Sales Agreement identifies the Approved Prospects. It lists Amazon as an Approved Prospect under the heading "Retail."[353] There is no dispute that the Amazon Sale involved "Products."

Amazon, however, was not the actual purchaser of the credit cards that CompoSecure sold in the Amazon Sale. Instead, Chase was the actual purchaser. This aspect of the Amazon Sale reflected the inherent structure of a co-brand relationship, in which the issuing bank makes the purchase as part of its agreement with the co-brand partner. The second sentence of Section 6.1 addresses this issue by stating that "a sale of Products shall be deemed to be a sale of Products to an Approved Prospect if . . . any other

---

[352] SA § 6.1.

[353] *Id.* sched. 2.

Person (including an Issuer Prospect, a Personalization Partner or an Excluded Customer) purchases Products directly or indirectly from CompoSecure on behalf of, for the benefit of, pursuant to a contract with, or bearing the trademarks or other identifiable marks of, an Approved Prospect." This opinion refers to this sentence as the "Deemed Sale Provision."

For purposes of the Sales Agreement, Chase is an "Excluded Customer." The Sales Agreement defines an "Excluded Customer" as "any company that is not listed on **Schedule 2** . . . ."[354] Chase is not listed on Schedule 2. Because Chase is an Excluded Customer, the Amazon Sale fits easily within the plain language of the Deemed Sale Provision, which identifies a purchase by an Excluded Customer as one example of "any other Person" who can purchase cards under circumstances that are deemed to be "a sale of Products to an Approved Prospect." Those circumstances exist where the purchaser buys cards "pursuant to a contract with, or bearing the trademarks or other identifiable marks of, an Approved Prospect." The Amazon Sale meets both criteria. Chase made the purchases "pursuant to a contract with" Amazon. Separately, the resulting cards bear "the trademarks or other identifiable marks of" Amazon.

So far, the Amazon Sale meets the plain language of Section 6.1. It is deemed to be a sale of Products to an Approved Prospect because Chase, an Excluded Customer, purchased the cards "on behalf of, for the benefit of, pursuant to a contract with, or bearing the trademarks or other identifiable marks of, an Approved Prospect."

---

[354] *Id.* § 1.

The language of the first sentence of Section 6.1, however, is made "Subject to **Section 6.2**." Titled "Commission Payment Terms," Section 6.2 addresses the logistics of paying a commission. Framed in six subsections, it addresses a variety of practical issues, including that (i) CardUX gets paid a commission "only at such times and only to the extent that" CompoSecure receives payment for the sale,[355] (ii) CardUX gets paid on a quarterly basis,[356] (iii) CardUX gets paid in US dollars by check or wire transfer,[357] and (iv) CardUX can draw advances against future commissions of $10,000 per month for the first fifteen months.[358] Another subsection describes the period of time during which purchases by the same Approved Prospect will qualify for additional commissions.[359] Finally, Section 6.2(f) identifies four circumstances in which CardUX "shall not be entitled to any Commission or other compensation."[360] The second is "subject to **Section 2.2** hereof, for any sale made to an Excluded Customer."[361] This decision refers to this language as the "Excluded Commission Clause."

---

[355] *Id.* § 6.2(b).

[356] *Id.* § 6.2(c).

[357] *Id.* § 6.2(d).

[358] *Id.* § 6.2(a).

[359] *Id.* § 6.2(e).

[360] *Id.* § 6.2(f).

[361] *Id.* § 6.2(f)(ii).

CompoSecure contends that the Excluded Commission Clause conflicts with the Deemed Sale Provision and renders the Sales Agreement ambiguous. As CompoSecure sees it, if CardUX receives a commission for the Amazon Sale under the Deemed Sale Provision, it receives a commission for a sale to Chase, an Excluded Customer, and therefore violates the Excluded Commission Clause.

The interplay between the Excluded Commission Clause and the Deemed Sale Provision does not create ambiguity. The language of the Sales Agreement recognizes that issuing banks purchase credit cards both for their own proprietary programs and for co-brand programs. For purposes of commissions, issuing banks come in two flavors. Some are Approved Prospects, and the Sales Agreement refers to these issuing banks as "Issuer Prospects." CardUX is entitled to commissions for all of their purchases. This is true whether the Issuer Prospect purchases cards for its proprietary programs or for a co-brand program and regardless of whether the co-brand partner is an Approved Prospect.[362] Other issuing banks, such as Chase, are Excluded Customers. For convenience, this decision calls them "Excluded Issuers." CardUX is only entitled to commissions for purchases made by Excluded Issuers when they are for a co-brand program with an Approved Prospect. CardUX is not entitled to a commission when an Excluded Issuer purchases cards for its in-house programs, like the Sapphire Card, or for a co-brand program where the partner is not an Approved Prospect.

---

[362] The list of Approved Prospects identifies twenty-three card issuers as Approved Prospects. *See* SA sched. 2.

The plain language of the Excluded Commission Clause creates this structure by stating generally that CardUX is not entitled to receive a commission for a sale to an Excluded Customer. The Deemed Sale Provision carves out an exception to this prohibition for deals in which an issuer purchases cards as part of a co-brand program with an Approved Prospect. If the issuing bank is already an Approved Prospect, then CardUX is entitled to a commission without reference to the Deemed Sale Provision. The provision only becomes relevant for purchases by persons who are not Approved Prospects, including purchases by Excluded Issuers. Under ordinary principles of contract interpretation, a specific exception like the Deemed Sale Provision controls over a broad prohibition like the Excluded Commission Clause.[363] Nevertheless, to make the relationship express, the Deemed Sale Provision states that it applies "[n]otwithstanding anything to the contrary in this Agreement" and "for all purposes under this Agreement."[364] No conflict exists.

The same analysis applies to other provisions in the Sales Agreement that prohibit sales to Excluded Customers and which CompoSecure cites to support its claim of conflict.

---

[363] *Assisted Living Assocs. Of Moorestown, L.L.P. v. Moorestown Twp.*, 31 F. Supp. 2d 389, 399 (D.N.J. 1998) ("In New Jersey, it is a well-settled principle of contract interpretation that, in construing the contract as a whole, specific terms or clauses control general terms or clauses."); *see also Bauman v. Royal Indem. Co.*, 174 A.2d 585, 590 (N.J. 1961) ("In the interpretation of a contractual instrument, the specific is customarily permitted to control the general."); *Wasserstein v. Kovatch*, 618 A.2d 886, 892 (N.J. Super. Ct. App. Div. 1993) (same).

[364] SA § 6.1.

One is Section 2.2, which generally provides that CardUX cannot sell to Excluded Customers. In its entirety, Section 2.2 states:

> Excluded Customers. Sales Representative shall not solicit orders from Excluded Customers during the Term. In the event Sales Representative receives an unsolicited communication from an Excluded Customer regarding the sale of Products, Sales Representative shall promptly notify CompoSecure, and CompoSecure shall determine whether such Excluded Customer should be added to **Schedule 2** and be deemed an Approved Prospect, and whether Sales Representative should therefore be entitled to continue communicating with such Excluded Customer regarding the sale of Products. Unless such Excluded Customer becomes an Approved Prospect (and, in such event, Sales Representative therefore becomes entitled to receive the Commission on sales to such former Excluded Customer during the Term), Sales Representative is not entitled to any Commission or other compensation for any sale made by CompoSecure or any other Person to an Excluded Customer. [365]

The plain language of Section 2.2 accomplishes two things: (i) it establishes a general prohibition on sales to Excluded Customers, and (ii) it provides a means for CardUX to earn a commission for sales to an Excluded Customer if the initial contact was unsolicited.

CompoSecure contends that triggering a commission under the Deemed Sale Provision would allow CardUX to sell to an Excluded Customer other than by using the exception for an unsolicited approach. This contention fails to recognize the distinction between (i) a sale to an Excluded Customer, which could take the form of an Excluded Issuer either buying for its own proprietary programs or for a co-brand partner that is not an Approved Prospect, and (ii) a deemed sale to an Approved Prospect, which can take place through an Excluded Issuer. The Excluded Commission Clause addresses the former.

---

[365] *Id.* § 2.2.

It is "subject to Section 2.2" because that section creates a path by which a commission can be paid for a sale to an Excluded Customer even when that sale would not qualify under the Deemed Sale Provision. The Deemed Sale Provision addresses the latter. A deemed sale does not need to follow the path in Section 2.2 because the Excluded Issuer is making the purchase indirectly on behalf of an Approved Prospect. Once again, the specific exception in the Deemed Sale Provision controls.

CompoSecure next cites Section 3.5 to support its claim of conflict. Titled "Prohibited Acts," it states:

> Notwithstanding anything to the contrary in this Agreement, neither Sales Representative nor its Personnel shall directly or indirectly:
>
> \*     \*     \*
>
> (c) subject to **Section 2.2** hereof, sell, market, advertise, promote, solicit the sale of or offer to sell any Products to an Excluded Customer . . . .[366]

Again, CompoSecure contends that compensating CardUX for a sale to Chase would conflict with this provision by permitting CardUX to sell, market, and solicit business from an Excluded Customer.

There is no conflict, and the same reasoning applies. Section 3.5(c) broadly prohibits sales to "Excluded Customers," which encompasses not only Excluded Issuers but also the universe of co-brand partners other than those identified on Schedule 2. Section 3.5(c) prohibits CardUX from approaching Excluded Customers. For an Excluded Issuer like

---

[366] *Id.* §§ 3.5, 3.5(c).

Chase, this means that CardUX cannot approach Chase directly. What Section 3.5(c) does not address is the fact that, by approaching co-brand partners that are Approved Prospects, CardUX's efforts could lead to an Excluded Issuer making purchases on behalf of an Approved Prospect. The resulting sale complies fully with Sections 3.5(c) and 2.2 because CardUX has not contacted an Excluded Customer. The question instead is whether CardUX receives a commission for the sale. The Deemed Sale Provision makes it clear that a commission is due.

Finally, CompoSecure cites Section 2.1 as a source of conflict. Section 2.1 appoints CardUX as "CompoSecure's exclusive independent sales representative with respect to the sale in the United States of Products to Approved Prospects during the Term."[367] CompoSecure observes that Section 2.1 does not appoint CardUX as CompoSecure's representative for sales to Excluded Customers.[368] That is consistent with the overall structure of the Sales Agreement. The parties did not authorize CardUX to sell directly to Excluded Customers. The parties did agree that CardUX could sell to Approved Prospects. The Deemed Sale Provision makes clear that if any person, including an Excluded Issuer like Chase, purchases cards for an Approved Prospect, then the sale is deemed to be a sale to an Approved Prospect.

---

[367] *Id.* § 2.1.

[368] Dkt. 146 at 43.

Section 6.1 thus requires that CompoSecure pay CardUX a commission for the Amazon Sale. Even though Chase, an Excluded Customer, actually made the purchase, the sale is deemed to be a sale to an Approved Prospect under the Deemed Sale Provision.

### b. The Amount of the Commission

CompoSecure has not paid CardUX a commission for the Amazon Sale. CompoSecure contends that, even if the Sales Agreement requires a commission, CompoSecure has not breached the Sales Agreement because the amount of the resulting commission is zero.

The plain language of Section 6.1 of the Sales Agreement entitles CardUX to a commission for the Amazon Sale equal to 15% of the Net Sales Price. The Sales Agreement defines Net Sales Price as follows:

> **"Net Sales Price"** means the sales price (exclusive of sales tax, freight, duties and other transfer taxes or fees, and after applying any discounts, credits, rebates or adjustment) actually payable by an Approved Prospect for Products sold to such Approved Prospect. Notwithstanding anything to the contrary in the foregoing, Net Sales Price does not include: (a) the value of any items that are furnished by CompoSecure to Approved Prospects without cost to such Approved Prospects (for example, samples, prototypes, or free products furnished as part of any advertising or promotion program); (b) amounts that CompoSecure receives under a Purchase Contract that are identified in such Purchase Contract as being paid in exchange for services, technical assistance, technical data or documentation furnished to the Approved Prospect by CompoSecure; and (c) any reimbursement that is received by CompoSecure for taxes, customs, duties, and the like, as well as the actual cost to CompoSecure of packing, crating, transportation and insurance during such transportation and separately charged to an Approved Prospect (including a small order handling charge for any Purchase Contract

requiring CompoSecure to ship Products in less than its standard box-lot quantities).[369]

Because the definition focuses on amounts "actually payable by an Approved Prospect," CompoSecure contends that the commission turns on how much money, if any, comes from the Approved Prospect. For the Amazon Sale, Amazon has not and will not pay any amounts. As the issuing bank, Chase purchases the cards and pays the amounts. CompoSecure's reasoning leads to a counterintuitive result: A sale triggers a 15% commission under Section 6.1, but that calculation generates zero dollars because the issuing bank is the actual purchaser.

When the definition of "Net Sales Price" is read together with the Deemed Sale Provision, it is obvious what the contract means. The Deemed Sale Provision states that "for all purposes under this Agreement, a sale of Products shall be deemed to be a sale of Products to an Approved Prospect." One of those "purposes" is calculating the Net Sales Price. Purchases of cards by "any other Person (including . . . an Excluded Customer)" are deemed to be purchases by the Approved Prospect for purposes of the Net Sales Price. Purchases of cards by Chase are deemed to be purchases by Amazon for purposes of the Net Sales Price.

### c. The Extrinsic Evidence

Under New Jersey law, a court may consider extrinsic evidence to help interpret the plain language of an agreement.

---

[369] SA § 1.

Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement, even where the contract is free from ambiguity, not for the purpose of changing the writing, but to secure light by which its actual significance may be measured. Such evidence is adducible simply as a means of interpreting the writing, [] not for the purpose of modifying its terms, but to assist in determining the meaning of what has been said. So far as the evidence tends to show, not the sense of the writing, but an intention wholly unexpressed, it is irrelevant. We are not at liberty to introduce and effectuate some supposed unrevealed intention. The actual intent of the parties is ineffective unless made known in some way in the writing. It is not the real intent but the intent expressed or apparent in the writing that controls.[370]

In this case, the extrinsic evidence confirms that a commission is due.

The Factual Background section details the negotiating history of the Sales Agreement. The back and forth confirms that CardUX's entitlement to a commission does not depend on establishing a connection between its marketing efforts and a particular sale. CompoSecure attempted to introduce efforts clauses, but CardUX consistently deleted them. After six months of negotiations, the final Sales Agreement omitted any efforts clause. To make CardUX's commissions contingent on showing a link between its efforts and a sale would give CompoSecure a deal point that it conceded at the bargaining table.

The extrinsic evidence of CompoSecure's response to the Amazon Sale similarly indicates that CardUX is entitled to a commission.

- When Logan first learned that CompoSecure might receive an order from Amazon, she emailed Hollin commenting. "Yikes, Kevin and Paul would get 15%."[371]

---

[370] *Newark Publ'rs Ass'n v. Newark Typographical Union, No. 103*, 126 A.2d 348, 353 (N.J. 1956) (citations omitted).

[371] JX 213 at 1.

- Logan later sent an email bemoaning the fact that CompoSecure "didn't insist on a lower commission" for Chase orders "since the whole point is to lower the concentration."[372] Hollin replied that CompoSecure should "live with the deal as agreed."[373]

- After Logan challenged Kleinschmidt over CardUX's entitlement to a commission, Hollin told her that CompoSecure did not have a strong position in denying CardUX's commission.[374]

- CompoSecure prepared a Board deck that discussed the financials of the Amazon deal, the deck included the impact of CardUX's commission.[375]

Taken as a whole, the most persuasive extrinsic evidence supports the plain language result.

In an attempt to show otherwise, CompoSecure develops two broad themes, then relies on them to contend that the Sales Agreement cannot mean what it says. First, citing its customer concentration issue with Chase, CompoSecure argues that the purpose of the Sales Agreement was to diversify away from Chase. CompoSecure then attacks the Amazon Sale as increasing, rather than decreasing, its customer concentration problem. Second, by excising snippets from emails, CompoSecure contends that CardUX agreed to "pay for performance" and only expected to be paid work it actually did. CompoSecure then attacks the commission for the Amazon Sale as an example of pay without performance that would reward CardUX with a commission for no work. These themes

---

[372] JX 219.

[373] JX 226 at 1.

[374] JX 311.

[375] JX 356 at 10, 508.

provide good rhetorical fodder, but they cannot override the plain language of the Sales Agreement or the weight of the extrinsic evidence.

### i. The Customer Concentration Theme

CompoSecure now contends that it hired CardUX to address its customer concentration problem by diversifying its revenue sources away from Chase. It follows, says CompoSecure, that the parties could not have intended to compensate CardUX for generating more business from Chase.

It is true that Kleinschmidt identified the Chase-customer-concentration issue during due diligence and that this issue remained a concern for CompoSecure, but it was not the driving force behind the Sales Agreement. The goal of diversifying away from Chase never came up, either during the early discussions about the relationship or during the subsequent negotiations over the Sales Agreement.[376] The Sales Agreement itself does not mention customer concentration or say anything about Chase. Nor does it contain any disincentives for sales to co-brand partners that had programs with Chase. As Logan ruefully noted in December 2015, after the prospect of the Amazon Sale arose, the Sales Agreement does not even provide for a lower commission on sales through Chase.[377] Although Chase is an Excluded Customer by dint of not appearing on the Approved Prospects list, the list identified seven co-brand partners who already had credit-card

---

[376] Frantz Tr. 675.

[377] JX 219.

programs with Chase.[378] After CardUX began working, it marketed to several of those prospects with CompoSecure's knowledge and support.[379]

Only after the Amazon Sale did Logan assert for the first time that "the whole point" of the Sales Agreement was "to lower the concentration" with Chase.[380] That is not what the discussions and negotiations show, nor is it supported by the structure of the Sales Agreement. CompoSecure wanted to grow its overall sales, and the Sales Agreement incentivized CardUX to assist in that goal.

Although I reject CompoSecure's *ex post facto* claim that "the whole point" of the Sales Agreement was to diversify away from Chase, I accept that one of CompoSecure's reasons for hiring CardUX was to address its customer-concentration risk. The relationship accomplished this in two ways. First, the Sales Agreement identified twenty-three credit card issuers as Approved Prospects, and it incentivized CardUX to pursue them by compensating CardUX for all of their purchases, including for their own proprietary programs. For CompoSecure, those sales would come from issuing banks other than Chase.

Second, the strategy of approaching co-brand partners indirectly addressed the underlying business risks created by Chase's disproportionate role. Customer concentration presented a problem, not simply because of the volume of business that came

---

[378] JX 533; *see also* Flanagan Tr. 598-99; Frantz Tr. 652; Logan Tr. 315, 345-46.

[379] *See* JX 305; JX 401; JX 529.

[380] JX 219.

from Chase, but because Chase made those purchases for its proprietary Sapphire Card program. Chase had control over that program and could choose whether, and to what degree, to offer metal cards. Chase historically bought cards when needed and would not enter into a long-term agreement, which hampered CompoSecure's ability to plan.

As Kleinschmidt explained at trial, co-brand agreements mitigated these risks. Once the requirement to buy metal cards became part of a multi-year co-brand agreement, the issuing bank was locked in, and the resulting orders would be more predictable and durable. Formally the customer would remain Chase, but in reality, the ultimate customers would be the multiple co-brand partners who had contractual rights to metal cards.[381]

CompoSecure has correctly pointed out that no contemporaneous documents explain the benefits of order durability, but this is because the issue of customer concentration never came up. The order durability concept strikes me as intuitively correct. If customer concentration had been a focal point, then Kleinschmidt or Frantz would have explained the benefits provided by co-brand agreements.

In my view, the evidence does not support CompoSecure's claim that because customer concentration was a significant concern during LLR's due diligence, and for CompoSecure generally, the parties must not have intended for CardUX to receive commissions for co-brand sales involving Chase. My sense of the extrinsic evidence is that

[381] Kleinschmidt Tr. 910-13.

91

it shows precisely the opposite: CardUX expected to be paid for co-brand sales involving Excluded Issuers, and CompoSecure understood this.

### ii. The Pay For Performance Theme

CompoSecure also contends the Sales Agreement was intended to be a "pay for performance" agreement and that CardUX represented that it would not get paid for work it did not do. Because the record demonstrated that CardUX's efforts did not play a role in generating the Amazon Sale, CompoSecure argues that paying CardUX a commission would result in "pay regardless of performance."[382] CompoSecure uses this theme to argue that the parties must have envisioned an implied efforts clause.

As a threshold matter, the "pay for performance" theme ignores the distinction that the parties drew between the sales and marketing efforts that CardUX would pursue and the mechanism by which CardUX would be paid. From the outset, the CardUX principals proposed to educate their industry contacts about metal cards. CardUX did not envision pitching purchasing departments to solicit orders. Section 3.1 of the Sales Agreement memorialized the types of efforts that CardUX was contractually obligated to undertake. The Sales Agreement was not a "no efforts" contract.

Because of the nature of their sales efforts, the CardUX principals consistently rejected any requirement that they establish a connection between their efforts and a particular sale. CompoSecure eventually agreed, and the Sales Agreement entitles CardUX

---

[382] Dkt. 146 at 1, 42; *see also* Hollin Tr. 58; Logan Tr. 205-06.

to commissions on all sales to Approved Prospects. This bright-line rule creates the potential for CardUX to earn a commission when its efforts have not played a role in a sale to an Approved Prospect, but it also creates the potential for CompoSecure to receive sales without paying commissions if CardUX's efforts result in sales for parties other than Approved Prospects. The arrangement is reciprocal.

Equally important, CardUX receives compensation only if CompoSecure determines that a sale is beneficial. The Sales Agreement gives CompoSecure sole discretion over whether to accept any sale to an Approved Prospect[383] *and* control over the contents of the list of Approved Prospects.[384] For the Amazon Sale, Logan recognized that, although the sale increased the amount of business going through Chase, the increased volume was highly valuable to CompoSecure. She wrote Hollin, "Oh boy Mitchell . . . . I know that we are trying to decrease the customer concentration but it's hard to say no to 70% margin business."[385]

In constructing its "pay for performance" theme, CompoSecure has collected a handful of references from a smattering of emails in which the CardUX principals mentioned being paid for their performance or compensated for the work they did. For

---

[383] SA §§ 5.1, 5.2. CardUX acknowledged that "CompoSecure's exercise of discretion may result in no Commission owed, or a reduction or delay in the payment of Commission owed, to [CardUX] under this Agreement." *Id.* § 5.2.

[384] *See id.* §§ 2.2, 3.3.

[385] JX 216; Logan Tr. 319.

starters, CompoSecure gets its "pay for performance" soundbite from a March 2015 email in which Kleinschmidt first proposed an independent sales organization "that sources new business for [CompoSecure] primarily (or solely) on a pay for performance basis."[386] From my review of the record, I believe both sides understood Kleinschmidt to mean that CardUX would get paid for performance in the sense that any payment would depend on growth in CompoSecure's sales. If CompoSecure's sales did not grow, then CardUX would not get paid. He was not suggesting that CardUX would have to show a causal connection between its efforts and the sale.

Along similar lines, CompoSecure extracts language from an email that Frantz sent to Kleinschmidt and Flanagan on June 11, 2015, in which he stated, "we should only get paid on work that we do."[387] Taking this line out of context, CompoSecure argues that the CardUX principals thought they should not get paid if they did not achieve sales. Restored to its proper context, Frantz was addressing a narrow situation in which a personalization partner secured business for CompoSecure. The full sentence read: "I added a situation where they [CompoSecure] don't pay us anything – where a perso partner gets a deal without us having any presentation or pitch with the company – that just seems fair to me – we should only get paid on work that we do."[388] Frantz's proposal sought to address

---

[386] JX 32 at 2.

[387] JX 85 at 1.

[388] *Id.*

Logan's concern about double commissions. In response, Frantz offered language that required CardUX to be meaningfully involved where the personalization partner made the sale.[389] This was the only proposal CardUX ever made that involved an efforts clause.[390]

CompoSecure next cites an email from June 9, 2015, in which Frantz reported on his discussions with Logan about how long CardUX would receive commissions for subsequent purchases by an Approved Prospect. Logan told Frantz that CompoSecure was "comfortable with providing perpetual commissions as long as your Team is meaningfully involved."[391] Frantz and Kleinschmidt wondered what she had in mind, so Frantz asked. He reported to Kleinschmidt:

> Her thought was that we stay involved in the sales process with the partner over time – make sure they're happy, collect information if we can, etc. . . . . Her comment though was that she didn't want us to "just set it up and then get paid for doing nothing[.]"[392]

Rather than demanding that CardUX show that its efforts led to a sale, Logan was concerned about CardUX following up after the sale.[393]

_____

[389] *Id.* at 1.

[390] Logan Tr. 338-39.

[391] JX 93 at 3.

[392] *Id.* at 2.

[393] To the same end, CompoSecure relies on an email that Logan sent to a lawyer summarizing the terms of the proposed agreement. Under the heading "Process," the email stated: "They will be compensated for any Compo product purchase by an approved prospect that is initiated during the term of our contract or for their prospects that become clients for the following 2 years after the termination of the contract." JX 95 at 4. The term sheet provided that CardUX would not earn a fee when "they cannot prove meaningful involvement in selling the co-brand partner and the new sale results in compensation to a

CompoSecure put the most emphasis on an email that Kleinschmidt sent on September 14, 2015, which stated: "We are definitely not looking to get credit for work that has been done and orders that would take place absent our efforts."[394] Restored to its proper context, this sentence formed part of Kleinschmidt's proposal to add three companies to the Approved Prospect list where CompoSecure had "already made inroads." Kleinschmidt was saying that if the three companies were added, then CardUX would only seek compensation for success beyond what CompoSecure had accomplished. Kleinschmidt labeled the request a "secondary / non contract" issue. His email cannot reasonably be read as overriding the balance of the negotiations and the plain language of the Sales Agreement.

These scattered snippets do not outweigh the overall course of the negotiations. After CompoSecure proposed that CardUX only receive compensation for sales to an identified list of prospects, the parties went back and forth over whether CardUX would have to satisfy some type of efforts clause. CardUX insisted on receiving compensation for sales to Approved Prospects without any type of efforts clause. Logan and Hollin understood CardUX's position and they ultimately agreed to it. The language of the Sales Agreement reflected the parties' shared understanding about what CardUX would be doing and how they would get paid.

---

personalization partner." *Id.* The "meaningful involvement" language addressed the personalization partner issue.

[394] JX 133 at 2.

In my view, what caused the problem in this case was not any misunderstanding or sharp dealing. Instead, it was Logan's expectation that CardUX would have to educate the market and work its contacts before any meaningful sales would come along. To the detriment of the parties' relationship, the Amazon Sale arrived so quickly that it raised obvious questions about whether CardUX's efforts could have had any conceivable role. Plus, it was such a large sale that it made the bright-line arrangement feel unfair. If the Amazon Sale had happened a year later, the parties would have celebrated together.

In hindsight, the parties might have agreed to a ramp-up period before commissions could be triggered to prevent a near-term windfall. If CompoSecure had asked for such a period, then CardUX likely would have asked for a symmetrical wind-down period. Instead, the parties opted for bright-line rules. The Sales Agreement has a bright-line start date, a bright-line end date, and a bright-line payment mechanism. In my view, the evidence does not support CompoSecure's claim that, because CardUX made references to "pay for performance" or to getting paid for work they did, the court should override the plain terms of the Sales Agreement.

### 3. CardUX's Damages

Under New Jersey law, the final element that CardUX must establish for a claim for breach of contract is the existence of damages. CardUX suffered damages because CompoSecure did not pay its commission for the Amazon Sale. The specific amount of harm will be considered when addressing the proper remedy.

## B.     Breach of Section 4.1

In the second of its two claims for breach of contract, CardUX asserts that CompoSecure violated its obligation under Section 4.1 to use commercially reasonable efforts to support CardUX's sales activities. This decision has already concluded that the Sales Agreement was a valid contract between the parties. For CardUX to prevail on this claim for breach, the record must demonstrate that CompoSecure failed to perform a defined obligation and that the breach caused CardUX to suffer harm.[395]

Section 4.1 of the Sales Agreement provides that "[d]uring the Term, CompoSecure shall use commercially reasonable efforts to support the sales and servicing efforts of [CardUX] contemplated by this Agreement."[396] Dovetailing with that obligation, Section 6.2(e) states that "CompoSecure shall refrain from intentionally taking any action, the primary purpose of which is to . . . reduce the Commission payable to the Sales Representative from sales of Products to any Approved Prospect."[397]

CardUX proved at trial that CompoSecure failed to use commercially reasonable efforts to support CardUX. Instead, CompoSecure intentionally obstructed CardUX's marketing efforts for the primary purpose of reducing its commissions. Whatever the term commercially reasonable efforts might require in terms of affirmative support for a

---

[395] *See EnviroFinance*, 113 A.3d at 787.

[396] SA § 4.1.

[397] *Id.* § 6.2(e).

counterparty's efforts, it certainly precludes actively interfering with a counterparty's efforts.[398]

In this case, the evidence demonstrates that, after the dispute over the Amazon Sale arose, CompoSecure instructed CardUX not to speak with any Approved Prospects who issued their cards through Chase.[399] CompoSecure also refused to provide CardUX with samples for Disney and for industry consultants.[400] Logan later broadened these restrictions, shutting down CardUX's efforts to pursue opportunities with other non-Chase Approved Prospects, such as Qantas.[401] CompoSecure took these steps to pressure CardUX into agreeing to accept lower commissions on business that went through Chase.[402] Logan similarly issued a "pause" on providing support to CompoSecure, not because of capacity

---

[398] *See Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 273 (Del. 2017) (noting that commercially reasonable efforts "placed an affirmative obligation on the parties" in the merger context "to take all reasonable steps to . . . complete the transaction"); *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 18 (Del. Ch. 2009) (holding it was not commercially reasonable to go "radio silent" and delay the flow of information in merger discussions); *see also* Kenneth A. Adams, *A Manual of Style for Contract Drafting* 163 (3d ed. 2013) (noting that recent cases have held the appropriate standard is one of diligence).

[399] Logan Tr. 395-96 (Logan describing her instruction to CardUX not to talk to any co-brand partner that issued its cards through Chase); *see also* JX 350 at 2.

[400] *See* JX 350 at 2.

[401] *See* JX 438 at 1 (CompoSecure instructing CardUX not to discuss metal cards with Qantas, despite Qantas being an Approved Prospect).

[402] *Id.* at 1; JX 354 at 1-2.

constraints or for other business reasons but, rather, in preparation for litigation with CardUX.[403]

By interfering with CardUX's efforts, CompoSecure harmed CardUX. The amount of CardUX's damages is addressed when this decision addresses the proper remedy.

## C.    Unclean Hands

CompoSecure initially raised a host of affirmative defenses. In post-trial briefing, those defenses boiled down to a claim that Kleinschmidt breached his duty of loyalty when negotiating the Sales Agreement, resulting in CardUX having unclean hands. Based on the trial record, Kleinschmidt did not breach his duty of loyalty (assuming he had one under these circumstances), and unclean hands does not provide a defense to CardUX's claims.

The equitable doctrine of unclean hands

> is not strictly a defense to which a litigant is legally entitled. Rather, it is a rule of public policy to protect the public and the court against misuse by persons who, because of their conduct, have forfeited the right to have their claims considered. The question raised by a plea of unclean hands is whether the plaintiff's conduct is so offensive to the integrity of the court that his claims should be denied, regardless of their merit.[404]

"The Court of Chancery has broad discretion in determining whether to apply the doctrine of unclean hands."[405]

---

[403] JX 426 at 2.

[404] *Gallagher v. Holcomb & Salter*, 1991 WL 158969, at *4 (Del. Ch. Aug. 16, 1991) (Allen, C.) (internal citations omitted), *aff'd sub nom. New Castle Ins., Ltd. v. Gallagher*, 692 A.2d 414 (Del. 1997).

[405] *SmithKline Beecham Pharm. Co. v. Merck & Co., Inc.*, 766 A.2d 442, 448 (Del. 2000) (citation omitted).

"While extensive, the discretion of the Court is by no means absolute. Doctrinally there are a number of limitations on the application of the maxim."[406] "The greatest limitation on the doctrine is the widely accepted exception that since it is ultimately based on public policy, countervailing public policy which points in the direction of reaching the case on the merits can preclude its operation."[407] In this case, the countervailing public policy stems from the importance Delaware affords to negotiated contracts. "When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract."[408] Requiring parties to live with "the language of the contracts they negotiate holds even greater force when, as here, the parties are sophisticated entities that bargained at arm's length."[409]

In the only remaining manifestation of its unclean hands defense, CompoSecure argues that Kleinschmidt acted disloyally. This argument faces an initial hurdle because, as CompoSecure recognizes, the LLC Agreement eliminates all fiduciary duties.[410]

---

[406] *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 523 (Del. Ch. 1998).

[407] *Id.*

[408] *Libeau v. Fox*, 880 A.2d 1049, 1056 (Del. Ch. 2005) (Strine, V.C.), *aff'd in part, rev'd in part*, 892 A.2d 1068 (Del. 2006).

[409] *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002) (Strine, V.C.).

[410] *See* LLCA § 5.1 ("[I]n accordance with applicable law, any and all fiduciary duties of the Members and members of the Board (including fiduciary duties) to the

CompoSecure therefore attempts to derive the existence of a contractual duty of loyalty by equating "good faith" as manifested in the implied covenant of good faith and fair dealing with "good faith" as a subsidiary element of the duty of loyalty.[411] In my view, those concepts are distinct and cannot be equated.[412] But this decision need not re-plow that ground, because, assuming for the sake of argument that Kleinschmidt did owe a duty of loyalty, he did not breach it when negotiating the Sales Agreement.[413]

According to CompoSecure, Kleinschmidt breached his duty of loyalty by seeking an agreement that was contrary to CompoSecure's interests:

> Kleinschmidt knew the primary goal shared by CompoSecure's management and LLR (the majority owner that named him to the Board) was to reduce

Company or to another Member or member of the Board or to another person that is a party to or is otherwise bound by this Agreement shall be eliminated to the maximum extent permitted by law.").

[411] *See* Dkt. 146 at 60-61.

[412] *See, e.g., ASB Allegiance*, 50 A.3d at 440-45 (discussing concept of "good faith" as used in the implied covenant and as distinct from the duty of loyalty); *Lonergan v. EPE Holdings, LLC*, 5 A.3d 1008, 1017-19 (Del. Ch. 2010) (same). In making its argument, CompoSecure relies heavily on *Dieckman v. Regency GP LP*, 155 A.3d 358 (Del. 2017). I read that decision as applying the implied covenant of good faith and fair dealing in its contractual sense and holding that intentional misrepresentations violated the implied covenant. That holding was consistent with prior Delaware authority interpreting the implied covenant. *See ASB Allegiance*, 50 A.3d at 442-44 (collecting precedents supporting proposition that fraud violates the implied covenant). I do not believe that *Dieckman* supports using the implied covenant as a fiduciary duty equivalent.

[413] CompoSecure contends that "[g]iven Kleinschmidt's clear conflict and exaltation of his personal interest in CardUX, his duties should be scrutinized under the entire fairness standard." Dkt. 146 at 64. This argument further demonstrates how CompoSecure equates a contractual concept (the implied covenant of good faith and fair dealing) with fiduciary duties (the duty of loyalty) and then introduces them under the heading of an affirmative defense (unclean hands).

102

the Company's dependence on Chase to achieve a higher valuation. Yet he now claims to have negotiated a contract with CompoSecure that entitles his company to commissions for sales it had nothing to do with, including this particular sale to Chase, which worsened the very problem on which the Board was focused and for which it agreed to hire CardUX in the first place.

This paragraph rehashes CompoSecure's arguments about the extrinsic evidence as grounds for applying the doctrine of unclean hands.

As this decision discussed previously, the record does not support the assertion that "the primary goal" driving the Sales Agreement was to reduce customer concentration. It might have been *one* of the goals, but it was not the exclusive goal. CardUX's efforts to increase CompoSecure's overall sales by acting in compliance with the Sales Agreement do not warrant the application of unclean hands.

Similarly, the Sales Agreement entitles CardUX to commissions without the need to show a connection between CardUX's efforts and a particular sale. The parties reached that result after extensive negotiations. The Amazon Sale falls into one of the areas where the bright-line arrangement fits poorly with what an efforts-based regime would produce, but that is the bargain the parties struck. Seeking compensation in compliance with a bargained-for arrangement does not equate to unclean hands.

Most stridently, CompoSecure contends that the Amazon Sale represents "an enormous windfall commission on a sale CardUX had nothing to do with," resulting in a contract that is "egregiously one-sided."[414] The Amazon Sale is indeed an example of the

---

[414] Dkt. 146 at 63.

type of windfall compensation that could result from the bright-line commission structure, but that does not mean that the Sales Agreement is "egregiously one-sided." Because the list of Approved Prospects is limited, there easily could be sales where CardUX's efforts contribute to a massive order for a co-brand partner, but the purchaser is not an Approved Prospect. Under those circumstances, CardUX will not get a commission, and CompoSecure will receive a windfall benefit.

It is true that Kleinschmidt bargained in his own interest when he negotiated the Sales Agreement, but this does not mean he has unclean hands. Kleinschmidt openly negotiated opposite Logan and Hollin. They and the rest of CompoSecure's leadership team knew about Kleinschmidt's interests and his roles as a manager and member of CompoSecure. Bargaining at arms' length, Kleinschmidt repeatedly struck any efforts clauses from the Sales Agreement and clearly communicated that CardUX would not accept any efforts requirement. Although CompoSecure's witnesses testified during this litigation that they did not understand that fact, I cannot credit that testimony. Kleinschmidt and Frantz were too clear and consistent for there to have been any doubt. Relatedly, CompoSecure has not identified any misrepresentations that Kleinschmidt made. Although CompoSecure has pulled statements out of context, their meaning in context is clear.

This is not a case where unclean hands should be used to implement a form of quasi-reformation. The parties bargained for terms. Those terms should be enforced.

## D. The Remedy

In New Jersey, "judicial remedies upon breach of contract fall into three general categories: restitution, compensatory damages and performance."[415] "Compensatory damages put the innocent party into the position he or she would have achieved had the contract been completed."[416] "Most often, courts award compensatory damages in a breach of contract action."[417] While the non-breaching party must show that "the loss must be a reasonably certain consequence of the breach[,] . . . the exact amount of the loss need not be certain."[418]

CardUX is entitled to compensatory damages for past-due commissions for the Amazon Sale. During CompoSecure's 2016 fiscal year, Chase had purchased cards for Amazon worth $21,464,844, resulting in a total commission of $3,042,641 for CardUX.[419] As of March 9, 2017, Chase had purchased cards for Amazon worth another $16,938,395, resulting in an additional commission of $2,401,018 for CardUX.[420] CompoSecure estimated that Chase would make additional purchases of cards for Amazon during 2017

---

[415] *Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C.*, 921 A.2d 1100, 1107 (N.J. 2007) (internal quotation marks omitted) (quoting *Donovan v. Bachstadt*, 453 A.2d 160, 165 (N.J. 1982)).

[416] *Id.*

[417] *Id.* (citations omitted).

[418] *Donovan*, 453 A.2d at 166 (citations omitted).

[419] JX 400 at 1.

[420] *Id.* at 2.

of $58,438,000, resulting in an estimated commission of $8,283,587 for CardUX. Now that 2017 has concluded, the parties shall attempt to agree on the precise amount of past-due commissions. If the parties cannot agree within forty-five days, then further proceedings on this issue will be necessary.

CardUX failed to establish a recoverable amount of compensatory damages for proving that CompoSecure (i) failed to use commercially reasonable efforts to support CardUX's sales efforts under Section 4.1 and (ii) intentionally sought to reduce CardUX's commissions in violation of Section 6.2(e). CardUX is entitled to nominal damages of $1.00 for proving each breach.

CardUX also seeks a mandatory injunction compelling CompoSecure to comply with its obligation to support CardUX's sales efforts and an order of specific performance compelling CompoSecure to pay commissions when due. Both requests seek a form of specific performance, which is simply a mandatory injunction directing a party to comply with a contractual obligation. Because that is what CardUX seeks in this case, this decision only discusses the concept of specific performance and does not separately address the concept of a mandatory injunction.

Under New Jersey law, "[s]pecific performance . . . is appropriate when relief at law, money damages, provides inadequate compensation for the breach of an agreement."[421] "The appropriateness of the specific performance remedy also depends

---

[421] *In re Envir. Declaratory Judgment Actions*, 693 A.2d 844, 851 (N.J. 1997) (citations omitted).

106

upon the clarity of the terms of the contract. The oft-stated rule is that the terms of the

contract must be definite and certain so that the court may decree with some precision what

the defendant must do."[422] "Specific performance is particularly appropriate when . . . the

claim involves a continuing right to future benefits that cannot be satisfied by a one-time

monetary payment."[423]

The parties agreed that specific performance would be an available remedy for

breach. Section 16.12 of the Sales Agreement states:

> Equitable Remedies. Each Party acknowledges and agrees that (a) a breach
> or threatened breach by it of any of its obligations under this Agreement may
> give rise to irreparable harm to the other Party for which monetary damages
> may not be an adequate remedy and (b) in the event of a breach by such Party
> of any such obligations, the other Party shall, in addition to any and all other
> rights and remedies that may be available to it at law, at equity or otherwise
> in respect of such breach, be entitled to seek equitable relief, including . . .
> specific performance.[424]

---

[422] *Barry M. Dechtman, Inc. v. Sidpaul Corp.*, 446 A.2d 518, 521 (N.J. 1982) (citations omitted); *see also Restatement (Second) of Contracts* § 362 (1981) ("Specific performance or an injunction will not be granted unless the terms of the contract are sufficiently certain to provide a basis for an appropriate order."); 25 Richard A. Lord, *Williston on Contracts* § 67:4 (4th ed. 2002) ("By the great weight of authority, equity will not grant specific performance unless the terms of the contract are sufficiently certain for the court to decree with some exactness what the defendant must do.").

[423] *Envir. Declaratory Judgment*, 693 A.2d at 852 (citations omitted).

[424] SA § 16.12.

Although not controlling for purposes of this court's exercise of remedial discretion, Section 16.12 provides a sufficient basis for a decree of specific performance.[425]

On the facts of this case, an award of specific performance is not warranted. A decree that would require CompoSecure to pay commissions when due is not necessary. If CompoSecure fails to pay a commission, then CardUX can sue for breach and recover money damages, as it has here.

A decree enforcing the support obligation is also not necessary. As a matter of contract, CompoSecure already has that obligation. This court's decree would not provide more specific instructions or otherwise implement that obligation. It simply would add the imprimatur of an order and the threat of contempt sanctions for breach. Such an order would give CardUX additional leverage over CompoSecure in the future, but it would not help clarify CompoSecure's obligations or direct CompoSecure to take specific action.

In the pre-trial order and again at post-trial argument, CardUX requested injunctive relief extending the term of the Sales Agreement "for a period equal to the time during which CompoSecure failed to comply with its obligations to support and cooperate with CardUX'[s] sales efforts."[426] That relief is potentially apt, but CardUX did not mention it in either of its post-trial briefs. This aspect of CardUX's request for relief was waived.

---

[425] *Martin Marietta Materials, Inc. v. Vulcan Materials, Co.*, 68 A.3d 1208, 1226 (Del. 2012) (explaining that contractual stipulations as to the availability of equitable remedies "alone suffice" to support the granting of relief).

[426] PTO ¶ 105(h).

108

Finally, there is no need for a declaratory judgment regarding the interpretation of the Sales Agreement. This decision has held that CompoSecure's actions breached the Sales Agreement. A declaratory judgment to the same effect would be redundant.

## E.    Attorneys' Fees and Costs

CardUX seeks to recover its attorneys' fees and costs. CardUX relies initially on Section 12.2 of the Sales Agreement, which provides for indemnification. If contractual fee shifting is not available, then CardUX seeks fees in equity, contending that CompoSecure litigated in bad faith.

Section 12.2 of the Agreement states:

CompoSecure shall indemnify, hold harmless, and defend Sales Representative and its officers, managers, employees, agents, Affiliates, successors and permitted assigns (collectively, "**Sales Representative Indemnified Parties**") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorney fees, fees and the costs of enforcing any right to indemnification under this Agreement, awarded against any Sales Representative Indemnified Party in a final non-appealable judgment, relating to, arising out of or resulting from the following (including any third-party claim):

(a) material breach or non-fulfillment of any material representation, warranty or covenant under of [sic] this Agreement by CompoSecure or CompoSecure's Personnel, including **Section 11.2**;

(b)    any grossly negligent or more culpable act or omission of CompoSecure or its Personnel in connection with the performance of its obligations under this Agreement; or

109

(c) any bodily injury, death of any Person or damage to real or tangible personal property caused by grossly negligent or more culpable acts or omissions of CompoSecure or its Personnel.[427]

Subparts (a) and (b) in this provision encompass this case. At trial, Logan agreed.[428]

CardUX is entitled to indemnification under Section 12.2(a) because CardUX proved in this case that CompoSecure breached a material representation. In Section 11, CompoSecure represented that "the execution of this Agreement has been duly authorized by all necessary company action"[429] and that the Sales Agreement constituted a "legal, valid and binding obligation."[430] CompoSecure then took the contrary position that the Sales Agreement was *not* duly authorized and was *not* a legal, valid, and binding obligation. CardUX is entitled to indemnification for the losses it suffered as a result of CompoSecure's breach of a material representation.

CardUX also is entitled to indemnification under Section 12.2(a) because CompoSecure failed to perform a material covenant. That covenant took the form of CompoSecure's obligations in Section 4.1 to use commercially reasonable efforts to support CardUX's sales and marketing efforts. Relatedly, CardUX is entitled to indemnification under Section 12.2(b) because this decision has held that Logan intentionally obstructed CardUX's sales efforts for the purpose of depriving CardUX of

---

[427] SA § 12.2.

[428] Logan Tr. 320.

[429] SA § 11.1(c).

[430] *Id.* § 11.1(d).

commissions. CardUX only received an award of nominal damages for its breaches of Sections 4.1 and 6.2(e), making indemnification for its fees and costs all the more appropriate. Otherwise, CompoSecure would not face a meaningful consequence for its intentional breach of the Sales Agreement.

The parties might have raised interesting arguments about the scope of the indemnification provision, such as whether the provision is limited to third-party claims and whether a request for indemnification is currently ripe. No one has raised these issues, and this decision has not considered them. It does not intimate any view, one way or another, on the merits of those issues or others that might have been raised.

The parties shall confer on the amount of attorneys' fees and costs. If the parties cannot agree within forty-five days of this decision, then CardUX's counsel shall submit a Rule 88 affidavit. Unless CompoSecure's counsel produces their own billing records in full in support of an argument that CardUX's bills are too high, I shall consider the amount sought by CardUX to be reasonable.[431] Because CardUX is entitled to attorneys' fees and costs as a matter of contract, this court does not reach the bad faith exception to the American Rule.

---

[431] *See Ensing v. Ensing*, 2017 WL 880884, at *12 n.136 (Del. Ch. Mar. 6, 2017); *Horne v. OptimisCorp.*, 2017 WL 838814, at *5 n.54 (Del. Ch. Mar. 3, 2017); *Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 882 (Del. Ch. 2012) (Strine, C.).

**F.      Interest**

CardUX is entitled to pre- and post-judgment interest on the amounts due. Under New Jersey law, "the award of prejudgment interest on contract and equitable claims is based on equitable principles."[432] "Similarly, the rate at which prejudgment interest is calculated is within the discretion of the court."[433]

> The basic consideration is that the defendant has had the use, and the plaintiff has not, of the amount in question; and the interest factor simply covers the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled.[434]

The Sales Agreement does not provide for an interest rate. Lacking any reason to apply a different rate, pre- and post-judgment interest will accrue at Delaware's statutory rate,[435] fluctuating with the underlying Federal Discount Rate and compounded quarterly, until the date of payment.[436]

---

[432] *Cty. of Essex v. First Union Nat'l Bank*, 891 A.2d 600, 608 (N.J. 2006) (citation omitted).

[433] *Litton Indus., Inc. v. IMO Indus., Inc.*, 982 A.2d 420, 430 (N.J. 2009) (citation omitted).

[434] *First Union*, 891 A.2d at 608 (quoting *Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am.*, 323 A.2d 495, 506 (N.J. 1974)).

[435] *See* 6 *Del. C.* § 2301(a).

[436] *Levey v. Brownstone Asset Mgmt., LP*, 2014 WL 4290192, at *1 (Del. Ch. Aug. 29, 2014) (explaining rationale for fluctuating rate); *Taylor v. Am. Specialty Retailing Gp., Inc.*, 2003 WL 21753752, at *13 (Del. Ch. July 25, 2003) (using quarterly compounding interval for legal rate "due to the fact that the legal rate of interest most nearly resembles a return on a bond, which typically compounds quarterly").

## III. CONCLUSION

CardUX has prevailed on both of its claims for breach of the Sales Agreement. The parties shall confer regarding the specific amount of commissions that are due. The parties also shall confer regarding CardUX's attorneys' fees and expenses. Assuming the parties can agree on these issues, then they shall submit a final judgment that is agreed upon as to form. If there are issues that the court needs to address before a final judgment can be entered, then the parties shall submit a joint letter within sixty days that identifies those issues and proposes a path forward that will bring this case to a conclusion at the trial level.